**In re Charles E. BLANTON and Brenda Blanton, Debtors.**

**In re STATE OF ARIZONA, ex rel. Arizona DEPARTMENT OF REVENUE, Alleged Claimant.**

**Bankruptcy No. 88–13725lk.**

United States Bankruptcy Court,
W.D. Texas,
Austin Division.

Oct. 6, 1989.

Joanalys Smith, Small Craig & Werkenthin, Austin, Tex., for debtors.

Gary R. Stickle, David J. Dir, Office of Attorney General, Tax Div., Phoenix, Ariz., for Arizona.

Stanley Wright, Arlington, Tex., Trustee.

## MEMORANDUM OPINION SUSTAINING OBJECTION TO CLAIM

LARRY E. KELLY, Chief Judge.

The State of Arizona, *ex rel*, Arizona Department of Revenue (hereafter "Arizona") timely filed its proof of claim in the individual Chapter 7 bankruptcy case of Charles Blanton and Brenda Blanton on February 3, 1989. Arizona had timely filed a Proof of Claim for the same debt in the Chapter 7 bankruptcy case of Texas Painter Craft, Inc. (hereafter "TPC"). TPC is a corporation which as of the time it filed bankruptcy in Case No. 88–13708 on December 15, 1989 was 100% owned by Charles Blanton. The basis of TPC's debt to Arizona is unpaid sales taxes (gross receipts taxes) for the years 1985 and 1986 in the amount of $153,528.78 plus penalties and interest as of April 1989 of $45,837.95. It has been stipulated that this amount is a valid unsecured debt owed by TPC which arose out of gross receipts taxes incurred while TPC performed two contracts in the

state of Arizona between 1984 and 1986. These contracts involved rehabilitation of family housing at a Tucson air force base in exchange for approximately $10,000,000.00.

There is no dispute that TPC owes the taxes. The dispute is over whether Charles and Brenda Blanton are personally liable for payment of the taxes because Arizona asserts that the corporate entity of TPC should be disregarded, i.e., this Court should "pierce the corporate veil" of TPC. This issue was joined when Charles and Brenda Blanton objected to the claim of Arizona on February 9, 1989. A hearing was held on April 6, 1989. This is a core proceeding under 28 U.S.C. § 157(b)(2)(B) and (O).

## ISSUES PRESENTED

1.01 The ultimate issue is whether, under applicable law, this Court should pierce the corporate veil of TPC to hold Charles Blanton personally liable for the valid debts of TPC. As will be seen by the discussion below, this issue may be more coherently determined if several sub-issues are first decided.

1.02 Is Texas law or Arizona law (or federal law) the law of decision in this case?

1.03 Should the corporate veil be pierced because TPC was resorted to as a means of evading an existing legal obligation?

1.04 Should the corporate veil be pierced because TPC is the mere alter ego of Charles Blanton?

1.05 Should the corporate veil be pierced because the corporate entity of TPC and of its related entities [1] were used as a means of perpetrating fraud? Within this issue are several further questions:

(a) Must Arizona prove that it was defrauded by some means involving TPC and its related entities? This will be difficult to do since an element of fraud

is reasonable reliance and Arizona did not rely on any representations by TPC or the related entities because it did not examine representations or choose to be a creditor; it is an involuntary creditor simply because taxes are collected after they accrue.

(b) If Arizona must show fraud, may it meet its burden of proof by showing fraud on someone else? If so, has Arizona met its burden?

(c) If not actual fraud but mere unfairness or "a basically unfair device to achieve an inequitable result" [2] need be shown, is any of the following sufficiently unfair to justify piercing the corporate veil in this case:

1) TPC has filed bankruptcy and not all its debts will be paid in full.

2) TPC failed to file monthly operating reports as required by Arizona tax law.

3) TPC made loans to Charles Blanton and to its related entities that even under the business judgment rule appear to be a breach of the directors' fiduciary duties.

4) After TPC was insolvent, the directors caused some debts but not others (including that owing to Arizona) to be paid in apparent violation of their trust-fund-theory duty.

5) Accounts payable and receivable were shifted among the various entities as different entities needed cash and possibly in an effort to make certain entities appear healthier than they were by reporting large accounts receivable as assets without revealing that the account debtor was a related entity with questionable ability to repay.

## FINDINGS OF FACTS

*The Related Entities*

2.01 TEXAS PAINTER CRAFT, INC.

a. Texas Painter Craft, Inc. is a Texas corporation incorporated in Texas on Feb-

---

**1.** CEN–T, Inc., Mid–Con, Inc., Contractor's Leasing Corporation, Commercial Building Materials, Inc., Charles Blanton, Randy Blanton.

**2.** *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex. 1986) at 271.

ruary 10, 1972. (Exhibits 5 and 24 to Charles Blanton Deposition.)

b. The ownership history of Texas Painter Craft, Inc. is as follows:

| Time Period | 20,000 Shares Issued | To Whom Issued | % Ownership |
|---|---|---|---|
| 1972–1974 | 11,000 | Robert L. Guyler Co. | 55% |
| | 9,000 | Charles Blanton | 45% |
| 1974–May 1975 | 11,000 | TPC Treasury Stock | — |
| | 9,000 | Charles Blanton | 100% |

During the intervening years Charles Blanton owned a majority of the stock at all times. Various individuals, being John Walker, Randy Blanton and Walter Hesbrook, owned minority interests from time to time.

c. The officers and directors of Texas Painter Craft, Inc. from October 31, 1984 to date are as follows:

| Time Period | Name | Office | Director |
|---|---|---|---|
| Oct. 1984 Sept. 1986 | Charles Blanton | President/ Treasurer | Yes |
| | Brenda Blanton | Secretary | Yes |
| | Randy Blanton | Vice President | Yes |
| Sept. 1986 to date | Charles Blanton | President/ Treasurer | Yes |
| | Brenda Blanton | Secretary | Yes |

(Exhibits 2A–2E and 1B, Bates Nos. pps. 000538—000552, to Charles Blanton Deposition.)

d. Charles and Brenda Blanton are husband and wife. Randy Blanton is a son of Charles and Brenda Blanton. (Charles Blanton Deposition, pps. 7–8.)

e. Texas Painter Craft, Inc. was in the construction business and worked exclusively on Federal construction projects as a general or subcontractor. (Charles Blanton Deposition, pps. 34 and 104; Kenneth Chappell Deposition, p. 10.)

f. Texas Painter Craft, Inc. is presently an inactive corporation. Its former officers (since 1984) are all currently employed by New Tex Rehab Corporation. (Charles Blanton Deposition, pps. 6 and 204; Brenda Blanton Deposition, p. 3; Randy Blanton Deposition, pps. 4–5.)

g. Texas Painter Craft, Inc. filed Chapter 7 bankruptcy in Cause No. 88–13708 on December 15, 1989 in the Austin Division of the Western District of Texas.

2.02 CEN–T, INC.

a. Cen–T, Inc was a Texas corporation incorporated in Texas on February 23, 1977. (Exhibits 5B–F and 28 to Charles Blanton Deposition.)

b. Cen–T, Inc. was in the construction business relating to Federal construction projects for H.U.D. (Charles Blanton Deposition, p. 21.)

c. Cen–T, Inc., was a wholly owned subsidiary of Texas Painter Craft, Inc. from October 31, 1979 to approximately July 15, 1986. (Exhibits 3C, p. 13, 3B, p. 14 and 3A, p. 17 to Charles Blanton Deposition.)

d. For the report year of 1986 for filing with the Texas Comptroller of Public Accounts, Charles Blanton was the President and only director of Cen–T, Inc. Randy Blanton was Vice–President and Brenda Blanton was Secretary and Treasurer. (Exhibit 28, Bates Nos. pps. 000320 and 00321 to Charles Blanton Deposition.)

e. Cen–T, Inc. was "liquidated" during its fiscal year ended 1986. The "liquidation" was accomplished by merging its assets and liabilities with its parent company, Texas Painter Craft, Inc. (Exhibit 3A, p. 17 to Charles Blanton Deposition.)

## 2.03 MID–CON, INC.

a. Mid–Con, Inc. is a Texas corporation incorporated in Texas on April 1, 1983. (Plaintiff's Trial Exhibit 8; Exhibit 17 to Lou Ann Montey Deposition.)

b. The ownership history of Mid–Con, Inc. is as follows:

| Time Period | 1,000 Shares Issued | To Whom Issued | % Ownership |
|---|---|---|---|
| 1983 to Oct. 1958 | 800 | Geron Crumley, Trustee for Charles Blanton | 80% |
| | 200 | A.E. McClure, and/or Johnnie McClure; and/or Bill Holley | 20% |
| Nov. 1985 to Sept. 1986 | 1,000 | Geron Crumley, Trustee for Charles Blanton | 100% |
| Sept. 1986 to date | 1,000 | Randy Blanton | 100% |

(Exhibit 1 to Randy Blanton Deposition; Exhibits 3A, p. 11, and 3B, p. 14, to Charles Blanton Deposition; P.F. 12; Randy Blanton Deposition, pps. 20–23 and Exhibits cited therein; Exhibit 1, Bates No. 803, to Lou Ann Montey Deposition, Lou Ann Montey Deposition at 41–42.)

c. The officers and directors of Mid–Con, Inc. from inception to date are as follows:

| Time Period | Name | Office | Director |
|---|---|---|---|
| Apr. 1983 Sept. 1986 | A.E. McClure | President | Yes |
| | Johnnie McClure | Secretary | No |
| | Geron B. Crumley | — | Yes |
| | Bill Holley | — | Yes |
| Sept. 1986 to date | Randy Blanton | President | Yes |

d. Mid–Con, Inc. was in the construction business. It was set up, as was CEN–T, Inc., to avoid the problem Texas Painter Craft, Inc. had as being viewed as a subcontractor and to work on smaller projects. (Charles Blanton Deposition at 26. Lou Ann Montey Deposition at 41; Louise Masters Deposition at 23; Exhibit 17, Bates Nos. 1516–1519, to Lou Ann Montey Deposition; Exhibits 3A and B to Charles Blanton Deposition.)

e. Mid–Con, Inc. did not have any active work as of October 31, 1986 and is presently inactive. (Randy Blanton Deposition at 31, 34–35; Lou Ann Montey Deposition at 45.)

## 2.04 CONTRACTORS LEASING CORPORATION

a. Contractors Leasing Corporation is a Texas Corporation incorporated in Texas on October 28, 1976. (Exhibit 25 to Charles Blanton Deposition. Exhibits 13–14 to Lou Ann Montey Deposition.)

b. The ownership history of Contractors Leasing Corporation is as follows:

| Time Period | Shares Issued | To Whom Issued | % Ownership |
|---|---|---|---|
| May 1983 to June 1986 | 850 | Charles Blanton | 85% |
| | 50 | Randy Blanton | 5% |
| | 50 | Eddie Blanton | 5% |
| | 50 | Ronnie Blanton | 5% |
| June 1986 | 1,000 | Charles Blanton | 100% |

(*Supra;* Exhibits 1, at Bates No. 338, 342, 719–720, 723, 785, 803 and 813, Bates Nos. 1428–1438 to Lou Ann Montey Deposition.)

c. The officers and directors of Contractors Leasing Corporation from 1984 to date are as follows:

| Time Period | Name | Office | Director |
|---|---|---|---|
| 1984 to Oct. 1986 | Charles Blanton | President/Treasurer | Yes |
| | Brenda Blanton | Secretary | No |
| | Randy Blanton | Vice President | No |
| Oct. 1986 to date | Charles Blanton | President | Yes |
| | Brenda Blanton | Secretary | No |

(*Supra;* Exhibit 25 to Charles Blanton Deposition.)

d. Contractors Leasing Corporation was engaged in the business of leasing vehicles and construction equipment primarily to Texas Painter Craft, Inc. and/or Cen–T, Inc. (Charles Blanton Deposition at 29; Lou Ann Montey Deposition at 39; Louise Masters Deposition at 24; Exhibit 14, Bates Nos. 1451–1460 to Lou Ann Montey Deposition.)

e. Contractors Leasing Corporation is presently inactive. (Exhibits 30A and B to Charles Blanton Deposition; P.F.5 and 21; Lou Ann Montey Deposition at 40.)

## 2.05 COMMERCIAL BUILDING MATERIALS

a. Commercial Building Materials is a Texas corporation incorporated in Texas on November 19, 1984. (Exhibit 27 to Charles Blanton Deposition; Exhibit 21 to Lou Ann Montey Deposition.)

b. Charles Blanton owned the majority of the common stock of Commercial Building Materials from its inception to date. (Exhibit 3A at 11 to Charles Blanton Deposition.)

c. The only officer and director of Commercial Building Materials at the present time is Charles Blanton. Prior to tax report year 1988 for the Texas Comptroller of Public Accounts, Bill Holley and Zack Murray served as the officers and directors of Commercial Building Materials. (Exhibits 21 and 27 to Charles Blanton Deposition; Exhibit 21, at Bates No. 1631 and 1632, to Lou Ann Montey Deposition.)

d. Commercial Building Materials was in the business of supplying building materials to Texas Painter Craft, Inc. (Charles Blanton Deposition at 31–33.)

e. Commercial Building Materials has been liquidated. (Lou Ann Montey Deposition at 47–48.)

## 2.06 NEW TEX REHAB CORP.

a. New Tex Rehab Corp. is a Texas corporation incorporated in Texas on June 21, 1983. (Exhibit 29 to Charles Blanton Deposition; Trial Exhibits 9A–B.)

b. New Tex Rehab Corporation was owned from its inception to February 21, 1986 by William Armstrong, Sr. Fifty percent of the common stock was pledged to Charles Blanton as security to assure payment of advisory fees to Charles Blanton by William Armstrong. (Trial testimony of Charles Blanton.)

c. William Armstrong and his son, William Todd Armstrong, have been officers of New Tex Rehab Corp. since its inception. The Armstrongs and Geron. Crumley, counsel and trustee for Charles Blanton, have served as directors. (Exhibit 29 to Charles Blanton Deposition; Lou Ann Montey Deposition at 50 and 52; Exhibit 1, Bates Nos. 342 and 803 to Lou Ann Montey Deposition; P.F. 28.)

d. New Tex Rehab Corp. is engaged in the construction business and is currently working on several Federal construction projects. (Charles Blanton Deposition at 6, 25026; Brenda Blanton Deposition at 3–4.)

e. New Tex Rehab Corp. is presently active. (Charles Blanton Deposition at 6; Brenda Blanton Deposition at 3; Lou Ann Montey Deposition at 52.)

## 2.07 HOLLEY AND BLANTON

a. Holley and Blanton is a partnership between Charles Blanton and William Hol-

ley. (Charles Blanton Deposition at 35; Louise Masters Deposition at 26; Lou Ann Montey Deposition at 53.)

b. The partnership of William Holley and Charles Blanton was engaged in the business of ranching (aka, Blanton Ranch). Said ranching activities include raising livestock (e.g., cattle, sheep, goats) in the State of Texas. (Louise Masters Deposition at 26; Lou Ann Montey at 53. Charles Blanton Deposition at 131, 171, 210 and 212–213.)

### 2.08  BLANTON RENTALS

a. Blanton Rentals is a sole proprietorship of Charles Blanton and is presently inactive. (Charles Blanton Deposition at 34–35.)

b. The business of Blanton Rentals was the renting of trailer spaces and mini-storage. (*Supra,* at 34–35.)

### 2.09  MISCELLANEOUS RELATIONSHIPS

a. The physical addresses for Texas Painter Craft, Inc., Cen–T, Inc. and Contractors Leasing Corporation was 604 West Ave. C, Lampasas, Texas. (Charles Blanton deposition at 24–25, 30.)

b. The mailing address for Texas Painter Craft, Inc., Cen–T, Inc., Contractors Leasing Corporation and Charles Blanton and Brenda Blanton was P.O. Box 1017, Lampasas, Texas 76550. (Charles Blanton Deposition at 6, 25 and 30; Exhibit 25, *supra.*)

c. Certain employees of Texas Painter Craft, Inc. maintained the books and records of Cen–T, Inc., Contractors Leasing Corporation and Blanton Rentals and were paid only by Texas Painter Craft, Inc. (Louise Masters Deposition at 26–28; Lisa Canales Deposition at 20 and 24; Exhibit 22 A and B to Charles Blanton Deposition.)

d. The firm of Armagost & Associates or its predecessors have been the accounting firm for Texas Painter Craft, Inc., Cen–T, Inc., Mid–Con, Inc., Contractors Leasing Corporation, Commercial Building Materials, New Tex Rehab Corp., Holley and Blanton, Charles Blanton, Brenda Blanton and Randy Blanton from approximately October 1983 to date. (Exhibit 1, Bates No. 156, 1066, 1079, 1101, to Lou Ann Montey Depositions; Lou Ann Montey Deposition at 6; Exhibits 3A–C, 21–23 and 30 to the Charles Blanton Deposition; Trial Exhibit 9.)

e. TPC, Cen–T, Inc., Mid–Con, Inc., Contractor's Leasing Corporation, Commercial Building Materials, and the Holley and Blanton Partnership (the "Entities") are related parties to Blanton as that term is defined under Statement of Financial Accounting Standard No. 57. (See Trial Exhibit 13).

*TPC's Debt to Arizona*

2.10  Between 1984 and 1986, TPC performed two contracts of approximately $5,000,000 apiece to rehabilitate family housing at a Tucson, Arizona air force base. The exact amount of the two contracts was $10,228,807.36.

2.11  In 1985, the Arizona Department of Revenue audited TPC and assessed $129,270.64 in gross receipt tax and penalties and interest of $19,183.21 which TPC paid.

2.12  In 1986, during the time TPC performed the second contract in Arizona, the Arizona Department of Revenue again audited TPC and assessed $153,528.78 in taxes and $45,837.95 in penalties and interest, all of which remain unpaid by TPC.

*Stipulated facts*

2.13  The Debtors, Charles and Brenda Blanton have not agreed to be personally liable for the debt of TPC to Arizona.

2.14  There is no valid judgment which imposes personal liability for such debt on the Debtors.

2.15  No applicable statute imposes personal liability for such debt on the Debtors.

2.16·  The Debtors are liable for the debt of TPC to Arizona, if at all, because under Texas law the corporate veil of TPC should be pierced and Charles Blanton is the owner of 100% of the stock of TPC.

*Facts Relevant to Piercing the Corporate Veil*

2.17  In 1972, Charles Blanton paid $9,000.00 for a 45% interest in a new start up company, Texas Painter Craft, Inc. The

initial capital for the business including loans, and capital contributed by the 55% owner, Robert L. Guyler Company, was $60,000.00. Texas Painter Craft, Inc. performed painting subcontracts on government projects. In the beginning there were 10 to 12 employees. Charles Blanton and a combination secretary/bookkeeper handled the books and day-to-day operations. Everyone else painted. Gross receipts hovered around $300,000.00 per year.

2.18 In the early years the accounting firm of Arthur Young prepared financial statements for TPC in the form of a compilation which basically takes the financial data supplied by management and puts it in the form of financial statements without doing any independent checking as to the source of data, internal control procedures, etc.

2.19 After TPC had grown and obtained bonding from USF & G, Charles Blanton sought an accounting firm with more experience in accounting for construction companies. In November of 1983, he hired the accounting firm which is now known as Armagost & Associates. Lou Ann Montey, an accountant with the firm worked on many of the audits and reviews done for Texas Painter Craft. She is not a Certified Public Accountant. There are three levels of preparation of financial statements: compilation, review and audit. A compilation simply puts management's figures into a correct form. An audit involves independent verification of sources and uses of funds and assures third parties (typically creditors) that the financial statements fairly represent the financial condition of a company according to generally accepted accounting principles (GAAP) such as "matching", i.e. revenue is recognized as income when it is earned and expenses are recognized as such when they are incurred. Beginning with the year ended October 31, 1983, and continuing through October 31, 1986, Armagost & Associates prepared annual audited financial statements and performed a review every year, six months after the audit (April 1984, April 1985, April 1986). Financial statement for TPC were not prepared for 1987 and subsequent years because the firm became inactive.

2.20 For accounting and audit purposes, a "related party" is defined as an affiliate of an enterprise; principal owners of the enterprise; its management; members of the immediate families of principles of owners, of the enterprise; and other parties with which the enterprise may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests.

2.21 For accounting and auditing purposes, the auditor will treat related party transactions as follows:

a. Determine the existence of related parties.

b. Identify transactions with related parties including the extent and nature of business transacted between the parties.

c. Examine identified party transactions, including obtaining an understanding of the business purpose of the transaction, examining pertinent documents, determining whether the transaction has been approved by the board of directors or other appropriate officials, and inspecting or confirming and obtaining satisfaction concerning the transferability and value of collateral.

d. Adequately disclosing each material related party transaction or common ownership or management control relationship.

2.22 For accounting purposes, TPC had the following related parties: CEN–T, Inc., Contractors Leasing Corporation, Commercial Building Materials, Inc., Mid–Con, Inc., Holley and Blanton, and Blanton Rentals.

2.23 The 1985 audited financial statement for TPC discloses all related parties listed above except Commercial Building Materials, Holley and Blanton, and Blanton Rentals.

2.24 The 1986 audited financial statement for TPC discloses all related parties listed above except Holley and Blanton and Blanton Rentals.

2.25 TPC applied for an obtained an Arizona transaction privilege tax license effective October 1, 1984. TPC performed general contracting services at Davis Monthan Air Force Base in Tuscon, Arizona and said services were subject to Arizona sales taxes. Sales tax returns should be filed monthly, according to Arizona statute, but during the two-year period that TPC should have been filing Arizona sales tax reports monthly, it filed only two reports during the entire two years.

2.26 During the two-year period from October, 1984 to October, 1986, TPC was twice audited by the Arizona Department of Revenue. The result of these audits was that sales tax for the first year of operations in Arizona were assessed and paid, but sales taxes for the second year of operations, although assessed but not paid.

2.27 On March 15, 1972, Charles Blanton entered into an employment with TPC whereby he was to receive compensation of $275.00 per week plus 22% of the net profits before taxes at the end of the year. On October 8, 1973, the employment agreement of Charles Blanton was amended to increase his salary to $350.00 per week. There are no subsequent written employment agreements between TPC and Charles Blanton. This Court finds that the significance of this is merely that employment agreements between Charles Blanton and TPC after 1973 were oral rather than written. The evidence reveals that Charles Blanton took money out of TPC, some in the form of salary and some in the form of loans. It appears that no formal promissory notes memorialize these loans, although the accounting records of the business do reflect each loan transaction. All but $47,-000.00 of these loans had been repaid to TPC and the related entities by the end of 1987.

2.28 Arizona expends a great deal of effort pinning down exactly when Charles Blanton, TPC and several of the related entities became insolvent. The point at which a company or person becomes insolvent is important in a bankruptcy case when the Trustee seeks to recover fraudulent transfers of preferences. In the context of an action to pierce the corporate veil the point at which a company becomes insolvent is important in the trust fund theory *when a company has ceased to do business in the normal fashion* because at that point directors have a duty not to prefer one creditor over another and the corporate veil may be pierced when this has been done. However, because this Court does not find the trust fund theory applicable to this case, it will not make findings as to the exact point at which Charles Blanton or any of the related entities became insolvent.

2.29 Transfers in the form of loans among the various corporations and sales of stock from Texas Painter Craft in August 1983 to Randy Blanton may have been made for less than adequate consideration. These loans reveal the close relation among the entities and reveal that Charles Blanton and his family had significant actual control over the corporations but fall short of the egregious failure to distinguish between ones self and ones corporation that is condemned by cases which pierce the corporate veil on grounds of alter ego.

2.30 A significant number of intercompany loans are made between the related entities. Each transfer is fully documented in the accounting books of each corporation. This practice of lending capital among the related corporations to fund short term cash flow needs does not reveal a disregard of the legal separateness of the various corporations, but only reflects the factual relatedness of the various corporations.

2.31 TPC and the other companies described above as related entities were separate corporations. The fact that they were commonly owned and often acted in concert toward similar goals does not rise to the level of complete disregard of the corporate entity which is condemned by cases which pierce the corporate veil on grounds of alter ego. The Court finds that the reasons described by the Debtor for the failure of TPC: the dramatic recession in the construction industry in the southwest beginning around 1984, the fact that

Charles Hesbrook, a trusted employee, absconded with almost $1 million on a construction job in New Mexico, difficulties in computerizing the bookkeeping of TPC are credible and explain the insolvency and subsequent bankruptcy of TPC. Although the informality with which Texas Painter Craft was run may have contributed to its insolvency, the "injustice" of non-payment of the Arizona tax bill by TPC simply does not justify piercing the corporate veil of TPC and imposing the debts of TPC upon the sole shareholder, Charles Blanton.

## DISCUSSION

■ 3.01 As a preliminary matter I make clear that state law supplies the rule of decision in this case. Determination of whether the corporate veil should be pierced is a determination of the property attributes of stock ownership and of the relationship between a stockholder/director and his corporation. Such determinations are made by application of state, not federal law. *Butner v. United States,* 440 U.S. 48, 99 S.Ct. 914, 59 L.Ed.2d 136 (1979). In this case there has been some doubt whether Texas law or Arizona law should apply since TPC was incorporated in Texas, all related corporations were incorporated in Texas, Charles and Brenda Blanton reside in Texas and bankruptcy cases for both the Blantons and TPC are pending in a bankruptcy court located in Texas but the taxes for which TPC is liable and for which the Blantons may be liable arose in Arizona. Arizona argues in its Post–Trial Memorandum filed April 21, 1989 that Texas law applies because Texas is the state of incorporation of TPC, citing Restatement of Conflicts of Law 2d § 307, Comment a. The Blantons do not dispute this assertion. The Court agrees that the law of Texas applies.

3.02 Any discussion of the Texas law on piercing the corporate veil must begin with the case of *Castleberry v. Branscum,* 721 S.W.2d 270 (Tex.1986) (hereafter "Castleberry"). According to the Fifth Circuit, *Castleberry* "summarized and reshaped" the law of corporate disregard in Texas. *Pan Eastern Exploration Co. v. Hufo Oils,* 855 F.2d 1106 (5th Cir.1988). *Castle-* *berry* makes the general statement that a court will disregard the corporate fiction, or pierce the corporate veil, when "the corporate form has been used as part of a basically unfair device to achieve an inequitable result." *Castleberry,* supra at 271. The court then sets out seven specific grounds on which a court may pierce the corporate veil:

"(1) when the fiction is used as a means of perpetrating fraud;

(2) where a corporation is organized and operated as a mere tool or business conduit of another corporation;

(3) where the corporate fiction is resorted to as a means of evading an existing legal obligation:

(4) where the corporate fiction is employed to achieve or perpetrate monopoly;

(5) where the corporate fiction is used to circumvent a statute;

(6) where the corporate fiction is relied upon as a protection of crime or to justify wrong; and

(7) Inadequate capitalization is another basis for disregarding the corporate fiction."

*Castleberry,* supra at 272.

*Castleberry* makes clear that "alter ego", expressed above as item (2), while sometimes confused in the earlier cases with the entire field of disregard of the corporate fiction, is merely one of several possible bases for such disregard. Although *Castleberry* clears up possible confusion between the alter ego basis for piercing the corporate veil and the entire field, it may create confusion between the "used as a means of perpetrating fraud" basis and the entire field of disregard of the corporate entity which is only applicable when "the corporate form has been used ... to achieve an inequitable result."

3.03 In the case at bar, Arizona clearly asserts three of the *Castleberry* grounds for piercing the corporate veil.

1. Where the corporate fiction is resorted to as a means of evading an existing legal obligation.

2. Where a corporation is organized and used as a mere tool or business conduit of another corporation [or individual];

3. When the fiction is used for the means of perpetrating a fraud;

Each of these will be separately dealt with below.

*Incorporation as Means to evade Existing Obligation.*

■ 3.04 It is clear to me that the language used in *Castleberry* to describe this ground shows that the court meant to describe a situation in which an individual or an existing corporation owes debts and with intent to avoid liability for those debts, creates a new corporation and seeks to interpose the new corporation between the original debtor and the pre-existing creditor. Since TPC was incorporated in 1972 and the debt to Arizona, which was originally owed by TPC did not arise until 1984–1986, this ground is simply not applicable to the facts of this case and will not be further discussed.

*Alter Ego*

3.05 *Castleberry* states that:

Alter ego applies when there is such unity between corporation and individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice. *First Nat. Bank in Canyon v. Gamble*, 134 Tex. 112, 132 S.W.2d 100, 103 (1939).

and

Alter ego's rational is: "if the shareholders themselves disregard the separation of the corporate enterprise, the law will also disregard it so far as necessary to protect individual and corporate creditors." Ballantine, *Corporations*, § 123 at 294 (1946).

*Castleberry*, supra at 272.

■ 3.06 Although this may seem elementary and obvious, it bears emphasizing that piercing the corporate veil is the exception rather than the general rule. "The legal concept of a corporation as an entity with a personality distinct from the persons who compose it is fundamental in the law

of corporations." 15 TEX. JUR 3d *Corporations*, § 10 (1981).

In *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir.1988) the Fifth Circuit grappled with the conflict between the general sanctioning of the "corporate fiction" versus the occasional judicial "disregard of the corporate fiction":

Many wholly owned subsidiaries and closely-held corporations are not *factually distinct* from their owners. Many are *in fact* controlled and operated in close concert with the interests of the owners, and do not have a *distinct factual existence:* separate employees, offices of properties; consolidated financial reporting and tax returns; and the like. Such conduct is perfectly natural and proper and provides no basis for ignoring legal independence.

The problem arises when such a corporation is not treated as *legally distinct;* when, in other words, the owners neglect to maintain the formal independence of the corporation as required by law. *Pan Eastern*, supra at 1131 (emphasis added) (citations omitted).

3.07 Two Fifth Circuit cases attempt to apply post-*Castleberry* Texas law. These cases are *Pan Eastern*, supra and *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275 (5th Cir.1988). Each of these cases emphasizes that the focus of alter ego analysis should be on the relationship between the alleged alter egos; in this case therefore, the focus of alter ego analysis is on Charles Blanton and TPC to determine if the lack of separateness condemned by the *Castleberry* formulation is present.

*Corporate Form Used as a means to perpetrate fraud.*

3.08 Most of Arizona's voluminous evidence appears to be aimed at proving first that the corporate form of several of the entities related to Charles Blanton "has been used as part of a basically unfair device to achieve an inequitable result" and second that "the [corporate] fiction is used as a means of perpetrating a fraud." See *Castleberry* at pp. 271 and 272. As with all bases on which the corporate veil may

be pierced, this basis is highly fact specific. Findings of Fact are set out above but some discussion of the applicable legal standards will serve to focus attention on the most relevant facts.

■■■ 3.09 *Castleberry* makes clear that the type of inequity or injustice which will warrant piercing the corporate veil is much broader than those cases speaking strictly of fraud. *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275 (5th Cir.1988) at 1289. This solves one of the hurdles which might have kept Arizona from recovery in this case: Arizona would have had great difficult proving that it relied on any alleged misrepresentation of TPC or Charles Blanton because Arizona is simply not the sort of voluntary creditor which examines the financial statements of a proposed borrower before consciously choosing to extend credit. Arizona is an involuntary creditor by virtue of the fact that gross receipts taxes are not collected as they accrue but are collected in arrears. Thus, it is not classic fraud alone which will justify piercing the corporate veil but rather "unfairness."

This Court agrees with the Debtors' statement in their "Response to Post–Trial Memorandum" filed May 5, 1989 what "For better or worse, the *Castleberry* decision reduces the question of disregard of the corporate entity in Texas to a smell test."

■■■ 3.10 The only limitation on this broad strand of corporate disregard is that the focus must be on injustice or unfairness to the claimant caused by the corporation and its owners. The unfairness must be something greater than the mere failure to recover a full measure of damages. *Gibraltar Savings v. LDBrinkman Corp.*, 860 F.2d 1275 *citing Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir.1988) at 1133.

3.11 As the *Castleberry* court noted, there is a close connection between several doctrines which protect the corporation, shareholders of the corporation and creditors of the corporation. These doctrines are: (1) disregard of the corporate entity, (2) trust fund doctrine, (3) denuding theory and (4) fraudulent conveyances. *Castle-*

*berry* at 271, fn. 1. Although Arizona does not clearly plead any of these theories (other than piercing the corporate veil) much of Arizona's evidence fits into the trust fund or denuding theory. However, much of this evidence is irrelevant. The boundaries between these theories are not completely elastic. Here Arizona asks this Court to combine either (i) the trust fund theory with piercing the corporate veil or (ii) the trust fund theory with a director's fiduciary duty to his corporation.

■■■ The trust fund doctrine seems best suited to deal with the abuses that Arizona claims to be a victim of: that TPC paid other creditors but not it, that TPC made "loans" to Charles Blanton which were actually disguised dividends at a time the corporation was insolvent. The problem with applying the trust fund doctrine to this case is that it applies to "an insolvent corporation when it can no longer continue to do business in the usual way." *Tigrett v. Pointer*, 580 S.W.2d 375 (Tex. Civ.App.—Dallas 1978, writ. ref'd n.r.e.). The trust fund theory applies "when a corporation becomes insolvent *and ceases to do business.* State v. Nevitt*, 595 S.W.2d 140 (Tex.Civ.App.—Dallas 1980, writ ref'd n.r.e.). When the trust fund doctrine becomes applicable, the directors of the corporation have a duty to pay all existing creditors pro rata and a director may become personally liable to creditors who are not paid when he uses funds of the corporation to pay other creditors at the expense of the claimant. *Tigrett* at 383. At the time the gross receipts taxes owing to Arizona accrued, TPC was continuing to do business (or taxes would not have been accruing). Thus the trust fund doctrine is inapplicable to this case on its face. However, Arizona asks us to take the further step of combining the trust fund doctrine and piercing the corporate veil. There is some authority for this position in the case of *Tigrett v. Pointer*, 580 S.W.2d 375 (Tex. Civ.App.—Dallas 1980, (writ ref'd n.r.e.). In that case, an individual controlled a corporation which engaged in the business of building, owning, managing and selling apartment complexes. The corporation

was thinly capitalized and was kept afloat by "loans" from the sole shareholder. At some point in 1973 the company became insolvent. The owner's "solution" was to transfer all of the company's assets to himself in repayment of the company's debt to him, making no provision for any claims of outside creditors. A new company he formed then simply took over all business of the old company, free of all outside debts. The court in *Tigrett* found that the doctrines of piercing the corporate veil and trust fund need not be mutually exclusive if the sole shareholder is "guilty of such unfair manipulation of the corporate enterprise in his individual interest that he can no longer be allowed to interpose the separate identity of the corporation to insulate himself from personal liability." *Tigrett,* supra at 385.

■ There are several factual and legal distinctions between the *Tigrett* case and the TPC–Blanton case that make the former inapplicable here. First, of course, as explained above, the trust fund theory is not applicable in the case of TPC since TPC had not ceased to do business at the time the debt of Arizona arose. Further, the court found in *Tigrett* that a *purpose* of creation of the new corporation was to avoid the debts of the old corporation. In the instant case, loans to Blanton and payment of operational debts of TPC combined with decreased cash flow had the *effect* that Arizona was not paid. As was found above, the loans to Blanton and payment of operational bills were not motivated by a *purpose* to avoid Arizona's claim. In *Tigrett,* the court states with apparent incredulity "We are asked to believe that the old company has been laid to rest, with neither the absolution of bankruptcy nor the obsequies of formal dissolution, and that a new corporation in its image has sprung up like a Phoenix, full-grown and free of fiscal infirmity." In this case, TPC did file Chapter 7 bankruptcy under cause No. 88–13708 on December 15, 1987. In a Chapter 7 corporate bankruptcy, the purpose is to distribute any assets equitably among existing creditors before laying the defunct corporation to rest. A corporation does not

receive a discharge or a fresh start. Arizona has a legitimate forum within which to pursue any fraudulent conveyance claims. Therefore this court has no reason, as did the Texas court in *Tigrett,* to fashion an equitable remedy by combination of the trust fund and pierce-the-corporate veil theories.

■ The next combination of theories Arizona asks us to make is a combination of the trust fund doctrine with a corporate director's fiduciary duty to the corporation (i.e., shareholders) by finding that at the point a corporation becomes insolvent (even if continuing to do business), the duty to act in the best interest of the shareholders becomes a duty to act in the best interest of creditors because in a liquidation of an insolvent business the creditors would take all and shareholders take nothing. While there is some logic to this position, our research has revealed no Texas or Fifth Circuit cases which have extended a director's fiduciary duty this far and we decline to be the first court to do so.

There is a statement in *Gibraltar* that self dealing by a director shareholder may justify piercing the corporate veil. *Gibraltar Savings v. LDBrinkman Corp.,* 860 F.2d 1275 (5th Cir.1988) at 1293. The cite is to *Rose v. Intercontinental Bank,* 705 S.W.2d 752 (Tex.Civ.App.—Houston [1st Dist.]—1986). This may appear to be a statement that a director shareholder's breach of his fiduciary duties to his fellow shareholders may justify the remedy of piercing the corporate veil: a remedy that could benefit creditors pursuant to a suit brought by creditors.

However, examination of the facts of the *Rose v. Intercontinental Bank* case reveal that the statement that selfdealing by a director may justify piercing the corporate veil is made in the context of an alter ego case where the allegation is that the director did not properly distinguish between the corporation and himself and paid his own personal bills with corporate funds "without proper accounting". *Rose,* supra at 755.

Thus, I stand by my statement above that it is improper to combine the fiduciary

duty-to-shareholders theory with a piercing-the-corporate-veil theory. It is also important to note that the *Rose* case was decided by the 1st District Houston Court of Appeals about six months before the Supreme Court clarified in *Castleberry* the piercing the corporate veil was not the *same thing* as alter ego.

## CONCLUSIONS OF LAW

4.01 The standard described in *Castleberry* that the corporate veil will be pierced when "the corporate form has been used as part of a basically unfair device to achieve inequitable result" has not been shown in this case. As explained *Pan Eastern Exploration Co. v. Hufo Oils*, 855 F.2d 1106 (5th Cir.1988); "the unfairness must be something greater than the mere failure to recover a full measure of damages." It is primarily that unfairness of which the state of Arizona here complains. The entire Bankruptcy Code sanctions this "unfairness" in pursuit of a greater good when it provides debtors the means to obtain a fresh start even though all of their prior creditors have not been paid in full. TPC has filed bankruptcy. The remedy of the state of Arizona is to use the powers of the Trustee to marshal all of the assets of TPC for fair distribution among its creditors. Assets of TPC include any fraudulent conveyances or preferences recoverable under these standards of the Bankruptcy Code.

4.02 Arizona has not shown that alter ego is applicable in that there has been no showing that between TPC and Charles Blanton there is "such unity between the corporation and the individual that the separateness of the corporation has ceased and holding only the corporation liable would result in injustice". See *Castleberry*. Arizona has shown that there was a very close relationship among Charles Blanton, CEN–T, Inc., Mid–Con, Inc., Contractors Leasing Corporation, Commercial Building Materials, Inc., and Randy Blanton. However, this Court holds, that this close relationship indicates the sort of factual control which often exists in close corporations where the corporations are in fact controlled and operated in close con-

cert with the interests of the owners, but does not reveal the sort of total failure of legal distinction between owner and corporation as would justify disregard of the corporate entity. See *Pan Eastern Corp. v. Hufo Oils*, 855 F.2d 1106 (5th Cir.1988).

4.03 As to the final ground for asserting the corporate veil asserted by the state of Arizona: that TPC was resorted to as a means of invading an existing legal obligation, I find that the fact that TPC has been incorporated in 1972 and operated as a going business for many years prior to concurring its tax debt to the state of Arizona means that this ground is simply inapplicable.

Therefore, for all the reasons listed above, I find that the corporate veil of TPC should not be pierced; Charles and Brenda Blanton are not individually liable for the debts of TPC; and that therefore the objection of the Debtors, Charles and Brenda Blanton, to the Proof of Claim of the State of Arizona should be GRANTED.

A separate Order of even date will be issued herewith.