In re **SILICONE GEL BREAST IM-PLANTS PRODUCTS LIABILITY LITI-GATION (MDL 926).**

No. CV 92–P–10000–S.

United States District Court,
N.D. Alabama, S.D.

Dec. 2, 1993.

---

### OPINION and ORDER

### (DOW CHEMICAL AND CORNING SUMMARY JUDGMENT)

POINTER, Chief Judge.

Over the last several years thousands of lawsuits against numerous defendants have been filed across the country by persons claiming to have been injured from silicone breast implants. Those cases filed in or removed to other federal courts that have not been earlier resolved or remanded to state court have been, or are in the process of being, transferred to the Northern District of Alabama for pretrial purposes pursuant to 28 U.S.C. § 1407. Extensive discovery and other pretrial proceedings have been conducted in this court since June 25, 1992, when the first such cases were transferred to this district. Thousands of additional cases remain in, or have been remanded to, state courts. There are potential claims by thousands of other persons that have not yet been filed in federal or state court.

Under submission are motions by defendants The Dow Chemical Company ("Dow") and Corning Incorporated ("Corning") for judgment on the pleadings or, alternatively, for summary judgment. Dow and Corning have never themselves manufactured or distributed breast implants; they are, however, the sole stockholders of Dow Corning Corporation ("Dow Corning"), which has been one of the major suppliers of implants and raw materials. Although Dow and Corning initially moved for judgment on only three

causes of action,[1] the extensive briefing and oral argument on the motions have made it clear that they are moving for a complete dismissal of all claims against them.

Dow Corning was incorporated in the State of Michigan in February 1943. Dow and Corning were, and continue to be, Dow Corning's only stockholders, each owning an equal number of shares. During its fifty years of existence, Dow Corning has grown into a "Fortune 500" corporation, employing some 8,000 workers and manufacturing over 4,500 products in plants located in seven states and nine countries.

The impetus for the creation of Dow Corning was to facilitate access by the armed forces to silicone products during World War II by combining Corning's silicone technology with Dow's chemical processing and manufacturing expertise. Building upon the initial transfers of technology from its parent corporations, Dow Corning after the war developed many new commercial and industrial uses for silicone.[2] Among these products have been silicone gel breast implants, which Dow Corning first introduced on the market in 1964 after a period of clinical testing begun in 1962. The claims being made against Dow Corning in this litigation stem from its role—or the role of one of its subsidiaries—as a manufacturer and distributor both of silicone gel breast implants and of raw materials used by other manufacturers and distributors.

In their pending motions, Dow and Corning contend that there is insufficient evidence to allow the plaintiffs' claims, whether based on theories of corporate control over Dow Corning or their own direct liability, to go forward. In response, the Plaintiffs' Steering Committee ("PSC")—appointed by the court to coordinate discovery and other pre-

trial proceedings on behalf of all plaintiffs—has sifted through voluminous evidentiary materials obtained during discovery in an effort to demonstrate that there is a genuine issue of material fact on both types of claims and that summary judgment should therefore be denied. Alternatively, the PSC argues that, at a minimum, the motions should be denied or continued pursuant to FED. R.CIV.P. 56(f) pending further discovery. Upon considering the evidence marshalled by the parties, the court concludes that, because of facts not in substantial dispute, Dow and Corning are entitled as a matter of law to judgment, and, further, that additional discovery is highly unlikely to show any genuine issue of material fact.

## I. Summary Judgment Standard

▋ In its often-cited 1986 trilogy of summary judgment decisions, the Supreme Court has clarified how federal courts are to apply the standards of FED.R.CIV.P. 56.[3] *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Of particular significance to the motions now before this court are two principles. First, facts are treated as not in genuine dispute if, on the basis of the potentially admissible evidence shown (after appropriate opportunity for discovery) to be available for use at trial, or the demonstrated lack of relevant evidence, a party would be entitled at a trial to a favorable judgment as a matter of law under what formerly was known as a "directed verdict." In making this determination, the court considers the burden of production or persuasion and the standard of proof that

---

1. These claims are that Dow Corning is the "alter ego" of Dow and Corning; that Dow and Corning are liable under joint venture law; and that Dow and Corning negligently supervised Dow Corning.

2. The evidence indicates that Dow Corning has manufactured more than 2,500 different products using silicone polymers.

3. State courts, of course, do not necessarily follow these same standards when applying their summary judgment rules, even when the text of

the rule is identical with the federal rule. In particular, some states apparently use a "scintilla" standard to assess summary judgment, at least if that would govern the trial of cases in the courts of the state, or may classify certain types of issues as inherently not susceptible to summary disposition. Nevertheless, even in diversity cases removed from state court, federal courts would apply, as a procedural rule, the standards for summary judgment enunciated by the Supreme Court.

would apply at trial. Second, even litigation involving complex fact-intensive issues, such as in many antitrust cases, may be appropriately resolved through summary disposition when these standards are met.

## II. Choice of Law

With virtual unanimity, transferee courts in federal multidistrict proceedings under 28 U.S.C. § 1407 have concluded that, as in cases transferred under 28 U.S.C. § 1404, they should apply the substantive law that would have been applied in the various transferor courts. *See, e.g., In Re San Juan Dupont Plaza Hotel Fire Litigation,* 745 F.Supp. 79, 81 (D.P.R.1990) (quoting *Ferens v. John Deere Co.,* 494 U.S. 516, 110 S.Ct. 1274, 108 L.Ed.2d 443 (1990), for the proposition that after a § 1404 transfer "the transferee court shall 'apply the law of the transferor court, regardless of who initiates the transfer'"). *See also* MANUAL FOR COMPLEX LITIGATION, SECOND § 31.122 n. 25 (1985). The various transferor courts in these diversity jurisdiction cases would have been bound to apply substantive laws of the forum state, including its choice-of-law rules. *Klaxon Co. v. Stentor Electric Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). *See also* MANUAL FOR COMPLEX LITIGATION, SECOND § 33.23 n. 36 (1985). A state's choice-of-law rules might, in turn, direct the attention of the transferor court and consequently this court to the substantive law of still another state.[4]

At present, this MDL proceeding includes over 5,000 cases filed in this court or transferred here from district courts in 45 states, the District of Columbia, and Puerto Rico. Many states would call for this court, when

addressing "alter ego" and other "veil-piercing" issues, to apply the law of Michigan, where Dow Corning is incorporated. But, because of choice-of-law rules in other jurisdictions, this court might also be obliged to apply the laws of many other states. Variants in those states' laws theoretically could have resulted in summary judgment on this issue favorable to Dow, to Corning, or to both in cases originating in some states; in summary judgment favorable to the plaintiffs in cases from other states; and in simply a denial of summary judgment, to await the results of trial, in still others. The parties have, accordingly, searched for decisions throughout the United States.

On the issues presented by the current motions, the court's decision is less complicated than it might otherwise have been, since under the law of none of the states can the claims in this litigation be pursued against Dow or Corning. In reaching this decision, the court has concluded that the burden of proof (or persuasion) at trial would under all state laws be upon the plaintiffs. The court has assumed that, at trial, plaintiffs' burden would be measured under a "preponderance of evidence" standard, although in some jurisdictions the plaintiffs would perhaps be confronted by the more demanding "clear and convincing" standard.

## III. "Corporate Control" Claims

Plaintiffs have attempted to state three basic claims against Dow and Corning premised upon their role as the corporate parents of Dow Corning: piercing the corporate veil; joint venture; and negligent or otherwise improper supervision.[5]

---

**4.** Plaintiffs have suggested that a single federal choice-of-law rule might be appropriate. The cases cited, however, have been situations in which, though involving both federal and state law claims, the preeminent issue before the court was federal in nature. *E.g., Audit Services, Inc. v. Rolfson,* 641 F.2d 757 (9th Cir.1981) (ERISA claim); *Kitchens of Sara Lee, Inc. v. Sar-A-Lee, Inc.,* 1988 WL 56180, 1988 U.S.Dist. LEXIS 4780 (N.D.Ill.1988) (trademark and deceptive trade practices); *Coca-Cola Co. v. International Telephone and Telegraph Corp.,* 201 U.S.P.Q. (BNA) 424, 1978 WL 21385 (N.D.Ga.1978) (trademark and unfair practices). *See also United States v. Nicolet, Inc.,* 712 F.Supp. 1193 (E.D.Pa.1989) (sole issue was CERCLA). While

the Master Complaint in this case attempts to set forth some federal causes of action, those claims are dubious at best and clearly overshadowed by the state law claims.

**5.** The Amended Master Complaint filed by the PSC on May 3, 1993, provides a good example of the type of "corporate control" claims stated by plaintiffs against Dow and Corning.

Count XXI—As a result of their participation in various joint enterprises, joint ventures and/or parent/subsidiary relationships, Defendants are liable to the plaintiffs.

Count XXII—As a result of their control, negligent supervision and actual supervision of vari-

## A. Piercing the Corporate Veil

The concept of limited liability for corporations against creditors, both voluntary and involuntary, is fundamental in corporate law. As Justice Douglas stated, "[l]imited liability is the rule not the exception; and on that assumption large undertakings are rested, vast enterprises are launched, and huge sums of capital attracted." *Anderson v. Abbott,* 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944). Attempts to reach the assets of shareholders by piercing this "corporate veil" can succeed only under exceptional circumstances. *See, e.g., Baker v. Raymond International, Inc.* 656 F.2d 173, 179 (5th Cir. 1981). While it is true that the circumstances in which it is appropriate to pierce the corporate veil vary to some degree, there are several factors that all jurisdictions examine when faced with this issue. "In short, the corporate veil may be pierced upon a showing of improper conduct or that the corporation was either formed or used for some illegal, fraudulent or unjust purpose." 1 FLETCHER CYC. CORP. § 41, at 603 (Perm. ed.).

■ Before proceeding to examine the circumstances surrounding Dow, Corning, and Dow Corning, one may first ask whether veil-piercing is an issue that can ever be appropriate for summary judgment. Given the fact-intensive nature of the veil-piercing analysis, the determination is typically one to be resolved at trial, where the trier of fact can make choices as to credibility and weight of the evidence. *Luckett v. Bethlehem Steel Corp.,* 618 F.2d 1373, 1379 (10th Cir.1980); 1 FLETCHER CYC. CORP. § 41.95 (Perm. ed.). In its 1986 trilogy and more particularly in *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), the Supreme Court, however, has eschewed the effort to categorize particular issues as inherently not suscepti-

ble to summary judgment, directing instead a case-specific approach in federal courts that focuses on the standards of Rule 56.[6] In decisions both before and after *Matsushita,* federal courts have held summary disposition appropriate when warranted by material facts not in genuine dispute. *See, e.g., Luckett,* 618 F.2d at 1379; *Culbreth v. Amosa Ltd.,* 898 F.2d 13 (3d Cir.1990); *Miles v. Kohli & Kaliher Assoc., Ltd.,* 917 F.2d 235 (6th Cir.1990); *Coleman v. Corning Glass Works,* 619 F.Supp. 950 (W.D.N.Y.1985). Accordingly, while this court must not usurp the proper role of the jury, it may grant summary judgment if a trial could, under appropriate standards, have but one result.

The following facts are without any substantial dispute:

● Dow Corning was properly incorporated under the laws of Michigan in 1943, with Dow and Corning, two independent corporations, as its sole and equal shareholders

● Dow Corning began clinical trials on silicone gel breast implants in 1962, and began to make them available commercially in 1964

● Dow Corning has observed all corporate formalities, including, but not limited to, maintaining its own books; filing its own tax returns; hiring its own auditor; employing its own officers, management, and workers; owning and operating its own plants in seven states and nine countries; holding its own stockholders' and directors' meetings; and, in recent years, paying regular dividends

● Dow Corning has, during its 50 years of existence, grown in terms of increased net sales, total assets, working capital, and retained earnings—with its working capital more than doubling, and its re-

ous joint ventures and/or parent/subsidiary relationships, Defendants are liable to the plaintiff.

Count XXIV—Defendants are liable to the plaintiff as controlling persons, aiders and abetters, alter egos of their parent/subsidiaries and/or joint ventures.

This reference to the PSC's Amended Master Complaint for the "corporate control" claims

does not limit the holding of this opinion to plaintiffs who have adopted the Master or Amended Master Complaint. The opinion applies to all plaintiffs who have attempted to state a cause of action against Dow or Corning based on "corporate control."

6. As earlier observed, note 3 *supra,* this is not necessarily the view in all state courts.

tained earnings and total assets more than tripling, over the last twelve years

● Dow Corning in 1976 became one of the 500 largest industrial corporations in the United States, as measured by Fortune magazine

These facts clearly demonstrate a separate corporate existence for Dow Corning, recognized and respected by it and its parent corporations.

The question remains whether, despite these facts, the plaintiffs have shown the existence of evidence of undue control, manipulation, or other improper action by Dow and Corning that could justify piercing the corporate veil. The thrust of plaintiffs' argument, advanced in great detail in the PSC's briefs and supporting papers, is that the extent of control exerted by Dow and Corning over Dow Corning, combined with Dow Corning's alleged undercapitalization, might, when presented at a trial, justify a finding that Dow Corning is an "alter ego" or mere instrumentality of either or both of its parents.[7] The PSC has tenaciously pursued, and creatively presented, various details drawn from the 50 years Dow Corning has existed. At the risk of giving unmerited significance to these assertions by discussing them separately, the court will next address the various factors or indicia pressed in plaintiffs' briefs to support their contentions.

### 1. Domination and Control

According to the plaintiffs, inappropriate control and domination by Dow and Corning should be found by considering the following: the original intent and purpose of the parents' creation of Dow Corning; their providing technology, research, testing, personnel, and facilities to Dow Corning; their control and election of Dow Corning's board of directors; their management of Dow Corning's financial affairs; their awareness of, and participation in, the "Breast Implant Controversy"; and the special relationship between Dow and Dow Corning, including the sharing of facilities, services, and liability insurance.

The potential for misuse of the corporate form of business organization, greatest when a corporation is owned by a single stockholder, clearly exists with close corporations that, like Dow Corning, have only a few shareholders. Nevertheless, a proper evaluation of the plaintiffs' contentions should not disregard the fact that the protection of limited liability is generally accorded even for solely-owned corporations,[8] and that the shareholders of a corporation are permitted—and, indeed, required by law—to exert certain control over the affairs of the corporation. Transactions between corporations are ·legitimate and commonplace, and, when between one company and another with a significant or even controlling stock ownership in the former, do not necessarily suggest improper domination or a failure of the parties to respect their separate corporate identities.

■ That Dow and Corning viewed their formation of Dow Corning as a collaborative undertaking, anticipating synergistic benefits from their separate contributions to the new corporation, and protecting their individual interests in the stock structure,[9] hardly gives rise to any inference of an improper purpose or intent. Nor is there anything improper in deciding to use the corporate form to protect the shareholders against potential, though as yet unknown, liabilities from this undertaking. Indeed, those are the typical and legitimate expectations and goals of those who establish a corporation to conduct a business.

Although the limited liability ordinarily accorded with respect to corporate entities may be subject to attack upon establishing that a corporation was organized with the "specific intent to escape liability for a specific tort or class of torts," *Zubik v. Zubik*, 384 F.2d 267,

---

7. Although the Master Complaint and the PSC's brief state that Dow Corning's corporate veil should be pierced under an "alter ego" theory, the following discussion of Dow and Corning's liability is equally applicable to any other veil-piercing theory.

8. *See, e.g. Lowell Staats Mining Co. v. Pioneer Uravan, Inc.,* 878 F.2d 1259, 1263 (10th Cir.

1989); *Berkey v. Third A.R. Co.,* 244 N.Y. 84, 87, 155 N.E. 58 (1926) (Cardozo, J.); 1 FLETCHER CYC. CORP. § 41.35 (Perm. ed.).

9. From Dow Corning's inception, Dow and Corning have owned equal shares of stock, with provisions assuring pro rata preemptive rights to additional stock issues.

273 (3rd Cir.1967), clearly no such showing has been made in this case. Instead, the evidence demonstrates that, while Dow Corning was created in 1943 for the purpose of producing war-related silicone products, it did not even begin to test silicone gel breast implants until almost 20 years later and was not faced with any substantial number of breast implant claims until 25 years after that.

Dow and Corning provided technology, research, testing, personnel, and facilities to Dow Corning, both at the time of its formation and under agreements made in its early years. And, as plaintiffs contend, these contributions doubtless were key components in helping to build Dow Corning into the successful corporation that it became. The initial contributions to Dow Corning, whether as capital or in the form of these intangibles, can hardly be faulted as sinister or improper: this support is inherent in the organization of many new corporations.

■ Plaintiffs, however, stress that the parent corporations continued to make significant contributions to Dow Corning in the years following its organization, as by allowing Dow Corning to utilize their facilities and personnel to conduct silicone-related research. On one such occasion, Dow Corning and Dow entered into an agreement transferring several Dow employees to Dow Corning's payroll, while providing that they continue to carry out their work in Dow facilities. Although this type of collaboration would not be typical for wholly-independent companies, all of the instances identified by the plaintiffs occurred in the first six years of Dow Corning's existence and more than fifteen years prior to the first sales of silicone gel breast implants. Moreover, in each case Dow Corning reimbursed the parent corporation for the parent's expenses in carrying out the research, including lab time, personnel costs, and any other services, and, in exchange, all patents stemming from the work were assigned to Dow Corning. These arrangements—involving the payment of consideration for services rendered—during the formative years of a subsidiary's existence do not suggest a degree of involvement by the parent that supports a claim for piercing the corporate veil many years later.

■ Plaintiffs also point to tests and studies concerning silicone conducted by Dow and Corning, either on their own or in conjunction with Dow Corning. The evidence, however, does not indicate that the work done by Dow or Corning was anything more than the dealings of independent corporations who share common areas of expertise and interest. Prior to any undertakings to share research, testing, studies, or laboratory practices, agreements were executed by the companies setting out the allocation of costs, the distribution of profits or losses, and the requirement of confidentiality. In form and in substance, these arrangements appear to be of the type that are often reached between wholly-independent companies in the same industry.

■ As the only shareholders, Dow and Corning are, of course, responsible for the election of Dow Corning's board of directors; their performance of this legal obligation is not in and of itself evidence supporting a veil-piercing argument. It is correct that the majority of Dow Corning's board has, at all times, been composed of directors or officers of the two parents and that, in the early years, all of its directors were either current or former employees of Dow or Corning. Although the composition of a subsidiary's board of directors may be relevant to the piercing issue, the existence of common directors and officers is but one factor to be considered and certainly is not, by itself, sufficient to justify piercing the corporate veil. *See, e.g., C M Corp. v. Oberer Development Co.,* 631 F.2d 536, 539 (7th Cir.1980); *Bendix Home Systems, Inc. v. Hurston Enterprises, Inc.,* 566 F.2d 1039, 1042 (5th Cir. 1978). Despite the potential for conflicts of interest, the sharing of directors is a practice frequently found in parent and subsidiary relationships.

Plaintiffs stress the involvement of the parent corporations in Dow Corning's financial affairs—by providing loans to Dow Corning, by making their stock available under stock option and purchase plans offered to Dow Corning's employees, and by receiving various financial reports and recommenda-

tions. The evidence presented does not, however, support an inference of excessive or otherwise improper involvement in these matters by Dow and Corning.

 In general—and subject to certain important caveats, such as when the result is an substantially undercapitalized corporation—stockholders may supplement the capital of a corporation in a variety of ways, such as by purchasing long-term obligations or debentures, by guaranteeing debt obligations to third-parties, and, from time to time, by making direct, more temporary loans. While the parent corporations have made loans to Dow Corning, the evidence does not show that corporate formalities were disregarded, that the terms of the loans were disadvantageous to Dow Corning, that the loans were not repaid, or that the loans reflected an undercapitalized corporation.[10]

 The providing of Dow or Corning stock for use in the stock option and purchase plan offered by Dow Corning to its employees represents, of course, an involvement that would not ordinarily be found with wholly-independent corporations. On the other hand, neither does it indicate any domination or disregard of Dow Corning's separate existence. Since the desire of parent corporations to own all the stock of their subsidiary is a common and acceptable practice, the only opportunity for the subsidiary to provide its employees with the benefits of this typical form of special compensation is to look for stock elsewhere. The obvious approach is to make arrangements to obtain stock in the parent corporations, particularly where, as here, that stock is widely and publicly traded. The court views the matter concerning the use of the parents' stock as of minimal significance in considering plaintiffs' attempt to pierce the corporate veil of Dow Corning.

 The involvement of Dow and Corning in the financial affairs of Dow Corning through the election of the directors on Dow Corning's board cannot be denied. General policymaking, including financial matters, is a normal function of the board of directors of any corporation. *See* FLETCHER CYC. CORP. § 505 (Perm. ed.). Nor does any suggestion of improper domination and control arise from the fact that in Fall 1991 the parent corporations began receiving information concerning Dow Corning's potential breast implant problems, both through direct reports from Dow Corning to the parents' boards of directors and through reports from their officers and directors who were sitting on Dow Corning's board. It is altogether appropriate that a corporation communicate to its shareholders major events that may have significant impact upon the financial health of the company.

 Plaintiffs also assert that there have been special relationships between Dow and Dow Corning: their corporate headquarters are both located in Midland, Michigan, in close physical proximity; from 1961 to 1987 Dow Corning was listed as a co-insured on Dow's excess liability insurance policy issued by the latter's "captive" insurance company, Dorinco Reinsurance Company; and over the years there have been various other minor servicing arrangements between the two companies. These facts do not, however, singly or in combination, indicate a domination and control that supports piercing the corporate veil.[11] There is nothing improper in a primary insured's naming as an additional insured a corporation in which it has a substantial investment; rather, such a step would be entirely consistent with its legitimate interest, as a stockholder, in protecting its property from potential depletion or loss—not unlike the situation where the owner of any property obtains insurance to protect the value of its assets. By like token, should Dow and Corning provide financial support and assistance to Dow Corning in an attempt to effect a global settlement of breast implant claims against Dow Corning,

---

10. Plaintiffs also argue that the provisions of loans by Dow and Corning, combined with the manipulation of stock and dividend issuances, kept Dow Corning undercapitalized. This point will be addressed when the court examines plaintiffs' arguments concerning undercapitalization.

11. *Cf. Stedman Energy, Inc. v. Lenape Resources Corp.,* 175 A.D.2d 646, 572 N.Y.S.2d 576, 577 (N.Y.App.Div. 4th Dept.1991) (rejecting veil-piercing premised on fact that parent and subsidiary were co-insured under same policy).

such actions would not indicate any improper domination or control, but rather would be consistent with their interests as stockholders owning ·a valuable asset.

## 2. Undercapitalization

A key—and potentially essential—element in plaintiffs' position is their contention that Dow and Corning have manipulated Dow Corning's capital structure in such a manner as to leave Dow Corning "thinly" capitalized. They point to the parents' use of loans, and the need to issue additional capital stock during the formative years of Dow Corning, as methods to control Dow Corning's capital. They argue that Dow Corning's declarations of dividends beginning in 1957 have been used to keep Dow Corning undercapitalized.

An analysis of these actions, however, leads to the opposite conclusion. The loans were used to satisfy immediate needs by Dow Corning for additional funds,[12] and the purchase by Dow and Corning of additional capital stock demonstrates a desire by them to assure the long-term success, stability, and independence of their subsidiary. The fact that Dow Corning's directors waited fourteen years before declaring any dividends shows an intent to ensure that the company had sufficient capital for its continued success and stability. Since commencing to pay dividends, Dow Corning has done so at rates equal to, or below, the rates of other comparable corporations,[13] and it has retained 56% of the profits earned during those years. From 1980 to 1991, its working capital more than doubled, and its total assets

and shareholder equity tripled. The fact is that, contrary to plaintiffs' argument, Dow Corning has not been deliberately undercapitalized.

Plaintiffs contend in the alternative that, regardless of intent, Dow Corning is in fact currently undercapitalized. A corporation's capital should not be viewed in the abstract but rather in relation to its prospective liabilities. Therefore, according to plaintiffs, Dow Corning should be treated as undercapitalized since it potentially faces tens of thousands of claims from silicone gel breast implants, which could result in tort liabilities that would exceed its assets.

The proposition that capitalization should be viewed in light of a corporation's prospective liabilities, while appropriate when dealing with contractual liabilities, e.g., Shapoff v. Scull, 222 Cal.App.3d 1457, 1470, 272 Cal. Rptr. 480 (4th Dist.1990), is more difficult to apply in the context of potential tort liabilities. One could argue that, whenever the potential tort liabilities facing a corporation exceed its assets, the corporation is undercapitalized. Plaintiffs make this argument, but fail to cite any decision so holding, nor is this court aware of any such case.[14] As the movants point out, such a definition of undercapitalization would result in limited liability for a corporation in the tort context only when it does not need it, i.e., when the corporation's assets are sufficient to satisfy its liabilities.

A second interpretation would require a level of capitalization commensurate to the foreseeable risks of the business venture.[15]

---

**12.** As discussed earlier, there is no evidence that any of the loans were made on terms unfavorable to Dow Corning or that any of the loans were written off by Dow and Corning.

**13.** See "Dow Chemical Company's Reply Brief," Exh. A (showing that Dow Corning's dividends were well below the average dividends of other corporations for the same period of time, as reported by Standard and Poor's and the 1993 Economic Report of the President).

**14.** In fact, it has been held that a corporation's inability to cover a large damages ·award does not justify piercing the corporate veil. See, e.g., Walkovszky v. Carlton, 18 N.Y.2d 414, 419, 276 N.Y.S.2d 585, 223 N.E.2d 6 (1966).

**15.** See, e.g., Anderson v. Abbott, 321 U.S. 349, 362, 64 S.Ct. 531, 537, 88 L.Ed. 793 (1944) ("An obvious inadequacy of capital, measured by the nature and magnitude of the corporate undertaking, frequently has been an important factor in cases denying stockholders their defense of limited liability."); National Labor Relations Board v. Greater Kansas City Roofing, 2 F.3d 1047, 1053 n. 8 (10th Cir.1993) (viewing undercapitalization "in light of the nature and magnitude of the corporate undertaking"); J–R Grain Co. v. FAC, Inc., 627 F.2d 129, 135 (8th Cir.1980) (viewing capitalization "in relation to the nature of the business of the corporation and the risks the business necessarily entails"); Fletcher Cyc. Corp. § 44.1 (Perm. ed.) ("'Inadequate capitalization' means capitalization very small in relation to the nature of the business of the corporation and the risks the business necessarily entails.").

This approach does not penalize a corporation, and ultimately its stockholders, for liabilities that could not have been reasonably anticipated. As noted, Dow Corning did not enter the breast implant business until about 20 years after its incorporation, and the large influx of potential claims did not arise until more than 25 years after that. During this period of time, Dow Corning was retaining the majority of its profits, and by 1991 it had total assets of over two billion dollars and a 1.8 to 1 ratio of current assets to current liabilities. There has been no evidence to indicate that it was not maintaining a reasonably adequate level of capitalization for a company in its line of business.[16]

### 3. Veil–Piercing is Inappropriate

The evidence does not support plaintiffs' call to pierce the corporate veil, even under the least onerous of tests. Dow Corning is a corporation that was lawfully incorporated in the state of Michigan for the legitimate business purpose of building upon the contributions from two separate corporations. No evidence suggests it was created to deliberately escape tort liability—and certainly not for torts from silicone gel breast implants, which it did not even begin to test until nineteen years later. All corporate formalities have been respected by Dow Corning and its parents, Dow and Corning. There is no evidence of intermingling or commingling of funds or of any improper loans between the parents and the subsidiary. Dow and Corning did not collect any dividends from Dow Corning until almost fifteen years after its incorporation, thereby enabling Dow Corning to establish a firm financial foundation, and, in furtherance of this goal, Dow and Corning provided additional capital to Dow Corning through subscriptions to additional capital stock. Once Dow Corning began to declare dividends, it did so at an average rate equal to or below that of other similarly situated corporations. Dow Corning retained the majority of its profits, growing into one of the largest corporations in the

United States. There is no evidence that Dow and Corning drained Dow Corning of its assets, even after they had knowledge of the potential liability for silicone gel breast implants—indeed, during the years after Dow Corning's potential liability for breast implants became known, its parents in no way interfered with the continued growth in its working capital, retained assets, and total assets.

Although Dow and Corning have had significant contacts with their subsidiary, these contacts do not, singly or in combination, rise to the level of manipulation and control that would support a piercing of the corporate veil. As the only stockholders, Dow and Corning elect Dow Corning's directors, some of whom are current or former members of their own boards. These directors influence the financial policies of Dow Corning, but so far as appears only in a manner that is appropriate considering their responsibilities to the corporation and to its stockholders, Dow and Corning. The various business dealings between the three companies appear to have been carried out with due regard for the separate existence and interests of each, with all necessary corporate formalities being observed.

Absent evidence of undercapitalization of Dow Corning, or of manipulation or undue control by Dow and Corning, the plaintiffs' argument is tantamount to a call for disregarding the limited liability of corporate organizations whenever a closely-held corporation becomes confronted with potential tort liabilities that could exceed its assets. No court has taken such an expansive view of the veil-piercing doctrine, and this court refuses to do so now. Dow and Corning are entitled to summary judgment on all claims dependent on piercing the corporate veil.

### B. Joint Venture Liability

■ Plaintiffs next argue that Dow Corning is a joint venture of Dow and Corning. Of course, in a non-legalistic sense this is true, since Dow and Corning joined together

---

**16.** *Cf. Lowell Staats Mining Co. v. Pioneer Uravan,* 878 F.2d 1259, 1263 (10th Cir.1989) (summary judgment appropriate when plaintiffs failed to establish what constitutes adequate level of capitalization for uranium exploration business); *J–R Grain,* 627 F.2d at 135 (8th Cir.1980) (summary judgment appropriate when plaintiffs failed to establish what constitutes adequate level of capitalization for fertilizer brokerage business).

to form Dow Corning and have continued throughout its 50–year existence to own equal shares in it. Their contention, however, is that Dow Corning should somehow be treated as a "joint venture"—a form of business organization distinct from a corporation and more akin to a partnership—with the consequence that Dow and Corning would be jointly and severally liable for Dow Corning's obligations. There is no support under the laws of any jurisdiction for this attempt to classify Dow Corning as a joint venture.

Plaintiffs contend that the agreement between Dow and Corning to form Dow Corning establishes a joint venture. Plaintiffs stress the parents' ownership and control of Dow Corning and their expectation of sharing profits—factors which, however, stem from their status as stockholders of Dow Corning. In light of Dow Corning's 50 years of existence, plaintiffs gloss over any requirement that a joint venture be for a limited time period. Furthermore, they attempt to meet the requirement that the venture have a limited or discrete objective by asserting, in a creative display of advocacy, that the venture involved the distribution of a particular product line. This product line would include all products made from silicone polymers. Over the years this line has grown to include more than 2,500 different products, with silicone gel breast implants constituting less than 1% of the total sales.

Most jurisdictions require a showing "that the joint venturers have agreed to share in both profits *and losses.*" See, e.g., Donohoe v. Consolidated Operating & Production Corp., 982 F.2d 1130, 1139 (7th Cir.1992) (emphasis in original) (applying Illinois law). Plaintiffs argue that such an agreement by Dow and Corning can be inferred from their loans to Dow Corning, their subscriptions to additional capital stock, and other financial arrangements, as well as from the naming of Dow Corning as an additional insured in Dow's excess liability insurance policy. Dow and Corning, however, have not agreed to share, or indeed even to be individually re-

sponsible for, Dow Corning's debts or losses; and their decision to organize their venture in the form of a corporation, and thus to avail themselves of the protection accorded stockholders, is a clear indication that they had no such intention.[17]

The legal interplay between the joint venture and the corporate form has been evolving over the years. The traditional view is that "the two forms of business are mutually exclusive, each governed by a separate body of law." *Weisman v. Awnair Corp. of America,* 3 N.Y.2d 444, 449, 165 N.Y.S.2d 745, 144 N.E.2d 415 (1957) (citing *Jackson v. Hooper,* 76 N.J.Eq. 592, 599, 75 A. 568, 571 (N.J. 1910)).

There are cases holding that shareholders, when involved in a dispute concerning their respective rights and liabilities, "may be treated as partners vis-à-vis one another even when they operate through a corporation." *Itel Containers Int'l Corp. v. Atlanttrafik Express Service, Ltd.,* 909 F.2d 698, 702 (2d Cir.1990) (applying New York law). *See, e.g., Koestner v. Wease & Koestner Jewelers, Inc.,* 63 Ill.App.3d 1047, 21 Ill.Dec. 76, 381 N.E.2d 11 (3d Dist.1978); 8 Fletcher Cyc. Corp. § 3997.10 (Perm. ed.). No case, however, has been cited, or independently located by this court, that has adopted this approach to hold stockholders liable to third parties for activities of the corporation. Courts that have addressed such a contention have concluded that "the corporate form is to be respected in dealings with third parties." *Itel Containers v. Atlanttrafik Express Service, Ltd.,* 909 F.2d 698, 702 (2d Cir.1990) (applying New York law). *See also* 8 Fletcher Cyc. Corp. § 3997.10 (Perm. ed.).

Dow and Corning are entitled to summary judgment on all of the plaintiffs' claims against them premised on the theory of a joint venture.

### C. Duty to Control

■ Plaintiffs' last set of corporate control claims against Dow and Corning is based

---

17. A key characteristic of the corporate form is the existence of limited liability for its shareholders. *See, e.g., Chenault v. Jamison,* 578 So.2d 1059, 1061 (Ala.1991). A joint venture, on the other hand, subjects the investors to joint and

several liability. *See, e.g., Tehran–Berkeley Civil & Environmental Engineers v. Tippetts–Abbett–McCarthy–Stratton,* 888 F.2d 239 (2d Cir.1989) (applying New York law).

not upon a theory of excessive control and domination of Dow Corning, but rather upon the alleged inadequacy of their supervision of Dow Corning with respect to breast implants. The PSC contends that, under § 315 of the RESTATEMENT (SECOND) OF TORTS,[18] Dow and Corning as parent corporations have a special relationship with Dow Corning sufficient to impose a duty to control conduct of the subsidiary that might cause injury to third persons. The RESTATEMENT enumerates certain types of relationships in which such a duty should be imposed: the duty of a parent with respect to a child's conduct (§ 316); the duty of a master with respect to its servant's conduct (§ 317); the duty of a possessor of land or chattels with respect to its licensee's conduct (§ 318); and the duty of those in charge of a person having dangerous propensities (§ 319). Plaintiffs would expand this list to include a duty by shareholders—or at least corporate shareholders of a close corporation—to supervise activities of the corporation that can be reasonably anticipated to be injurious to third persons.

This court—and, on a certified question, the Alabama Supreme Court—recently addressed, and rejected, the attempt to extend § 315 to the relationship between parent corporations and their subsidiaries. Both courts held that "the duty to control doctrine may not be applied to hold a parent corporation liable for the acts of its subsidiary." *In re: Birmingham Asbestos Litigation,* 619 So.2d 1360, 1362–63 (Ala.1993); *In re: Birmingham Asbestos Litigation,* CV 90–P–2501–S (Pretrial Order No. 3) (May 16, 1991). While these decisions were based on Alabama law, the plaintiffs have not cited a single case from any other jurisdiction that has applied § 315 in a parent-subsidiary context. In fact, numerous courts have specifically held that "[t]he mere fact that there exists a parent-subsidiary relationship between the two corporations is insufficient cause to impose liability on the parent for the torts of

the subsidiary." *E.g., Parrillo v. Giroux Co.,* 426 A.2d 1313, 1321 (R.I.1981); *Rick v. RLC Corp.,* 535 F.Supp. 39, 44 (E.D.Mich.1981) (applying Michigan law).

Dow and Corning are entitled to summary judgment on all of plaintiffs' claims based on a shareholder's duty to control the activities of a subsidiary.[19]

## IV. Direct Liability Claims

Plaintiffs argue that Dow and Corning are—because of their own conduct related to the testing, production, and distribution of silicone gel breast implants—liable under theories of fraud, conspiracy, concert of action, aiding and abetting, or collective liability. The claims of fraud and conspiracy are based on allegations that Dow and Corning, in conjunction with Dow Corning and other manufacturers, concealed or suppressed the disclosure of facts about the dangers of silicone gel breast implants. The claims of concert of action, aiding and abetting, and collective liability are based on allegations concerning the participation of Dow and Corning in the development and funding of the implants and their role as suppliers or manufacturers of raw materials.

■ It is doubtful that any state currently imposes on a parent corporation a duty of disclosure to purchasers of a subsidiary's products; such a duty would have consequences to stockholders similar to the duty of supervision, which this court has rejected in Part III–C of this opinion. In any event, there is no evidence that Dow or Corning had any special knowledge of the alleged harmfulness of Dow Corning's implants, that either company manufactured or supplied raw materials which have contributed to any defect or hazardous condition of breast implants, or that their participation and funding was anything other than the proper activities of corporate stockholders.

18. RESTATEMENT (SECOND) OF TORTS § 315 (1965). Section 315 states, in relevant parts, There is no duty so to control the conduct of a third person as to prevent him from causing physical harm to another unless ... a special relationship exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct....

19. Plaintiffs also argue that the effect of the "control concept" is highly relevant to traditional veil-piercing theories. This argument has been addressed in the section on piercing the corporate veil.

Through a variety of documents, plaintiffs have attempted to show that Dow and Corning were involved in the manufacturing of the implants, as well as in the alleged suppression of information about their safety. When understood in the light of other evidence, however, these documents do not support the plaintiffs' contentions.

For example, plaintiffs have presented a document written by a Dow Corning employee, discussing the lack of funding available for testing of silicone, that appears to have been sent to an employee of Dow. All recipients of the letter, however, were in fact Dow Corning employees. Plaintiffs also point to a memo produced by another manufacturer, stating that it had obtained component materials from Dow. Further investigation has demonstrated, however, that this statement was a typographical error, and that the materials were actually obtained from Dow Corning.

Plaintiffs have produced minutes of a Breast Implant Manufacturers' Group 515B Committee meeting in an attempt to demonstrate Dow and Corning's involvement in decision-making surrounding the breast implant business. Although no representative of Dow or Corning ever attended a 515B meeting, the minutes reflect that employees of the companies present, of which Dow Corning was one, were asked to go back to their related corporations and seek funding for an implant registry. Dow and Corning deny—and no contradictory evidence has been presented—that they were ever asked by Dow Corning for such funding.[20]

Plaintiffs argue that, by contributing technology and know-how at the time of Dow Corning's formation and by subsequently conducting or participating in testing of products or materials, Dow and Corning should be subject to a direct cause of action respecting products manufactured and distributed by Dow Corning. No cases, however, have ever imposed direct liability based on a contribution of technology with respect to claims arising from a product that was not even developed until 20 years later. Nor, at least in the absence of evidence indicating the discovery of special dangers associated with silicone, would the fact that Dow conducted some tests suffice as a basis for imposing direct liability on it. Plaintiffs have hypothesized about other roles Dow or Corning might have played in the development or manufacture of silicone gel breast implants, but there is no evidence to indicate that plaintiffs' statements are more than mere conjecture.

Plaintiffs contend that a direct claim can be stated against Dow and Corning for Dow Corning's alleged fraud and breach of state and federal consumer protection statutes. According to the PSC, a parent corporation may be held liable for unlawful or tortious conduct of its subsidiary under such causes of action, without regard to the traditional requirements of piercing the corporate veil, if it can be demonstrated that the parent directed or participated in the acts. Cf. Seagate Technologies v. A.J. Kogyo, 219 Cal. App.3d 696, 268 Cal.Rptr. 586 (1st Dist.1990) (directors can be liable if they personally direct or participate in the tortious conduct). There is no evidence, however, to indicate that Dow or Corning had any special knowledge about the alleged risks and hazards of silicone or that either company directed, or participated in, any acts by Dow Corning that would constitute fraud or a violation of consumer protection statutes.

Dow and Corning are entitled to summary judgment with respect to the "direct liability" claims against them, including those based upon the "enterprise" theory.[21]

## V. Plaintiffs' Rule 56(f) Motion

Plaintiffs finally argue that summary judgment, even if otherwise currently warranted,

---

20. The other documents submitted by plaintiffs similarly fail to evidence any direct conduct by Dow or Corning.

21. Plaintiffs also say Dow and Corning should be liable for the acts of Dow Corning on the basis that the three corporations constituted a "composite business enterprise." See Kasel v. Remington Arms Company, 24 Cal.App.3d 711, 101 Cal. Rptr. 314 (Cal.Ct.App.1972). If, however, this court were to apply this doctrine, the plaintiffs would fail to satisfy the standard because the relationship between Dow, Corning, and Dow Corning is markedly different from that between Remington and the Mexican company CDM in the Kasel case.

should be denied or deferred at this time due to the present stage of discovery. FED. R.CIV.P. 56(f) "allows a party who 'has no specific material contradicting his adversary's presentation to survive a summary judgment motion if he presents valid reasons justifying his failure of proof.'" *Wallace v. Brownell Pontiac–GMC Co.*, 703 F.2d 525, 527 (11th Cir.1983) (quoting 10A C. WRIGHT, A. MILLER, & M. KANE, FEDERAL PRACTICE AND PROCEDURE § 2740 (1983)). The PSC contends that discovery is not sufficiently advanced to allow presentation of all evidence that might be available to oppose the pending motions—and, in particular, they argue that certain documents have been withheld by defendants as privileged and not all depositions have been completed.

The parties' presentations, however, show that additional discovery is unlikely to result in evidence that would defeat the motions for summary judgment. To justify relief under Rule 56(f) a party "must specifically demonstrate 'how postponement of a ruling on the motion will enable him, by discovery or other means, to rebut the movant's showing of the absence of a genuine issue of fact.'" *Wallace*, 703 F.2d at 527 (quoting *SEC v. Spence & Green Chemical Co.*, 612 F.2d 896, 901 (5th Cir.1980) (quoting *Willmar Poultry v. Morton–Norwich Products*, 520 F.2d 289, 297 (8th Cir.1976))).

An adequate time and opportunity for discovery has been provided during the 17 months these cases have been pending in this court. At one of the first pretrial conferences, Dow and Corning indicated their intention to file these motions, and the court directed that they not do so without court permission, in order to enable plaintiffs to conduct necessary discovery. After almost 12 months of discovery, the court concluded

that sufficient discovery—which has included the examination and indexing by plaintiffs of millions of pages of documentary materials from the defendants—had occurred and permitted the motions to be filed. These motions have now been pending for almost 6 months.[22] While some matters involving questions of relevance or privilege still remain to be resolved, there is nothing to indicate that these materials, if ordered produced, would have any significant impact on these motions.[23] Furthermore, in addition to depositions taken thus far in these MDL proceedings, the plaintiffs have had access to depositions taken in many other cases and, indeed, to exhibits and transcripts from the trials of still other cases. Concluding that it is highly unlikely that additional discovery will produce evidence sufficient to call for denial of summary judgment in favor of Dow and Corning, this court is denying the plaintiffs' request under Rule 56(f).

The granting of the motions of Dow and Corning for summary judgment is, however, an interlocutory order and will not at the present time be certified as final under FED. R.CIV.P. 54(b). It is possible that before final resolution of all claims involving all parties—whether in a particular case or on some consolidated basis—there might be reason to vacate these summary judgments because of the discovery of additional information or, indeed, because of a change of law in one or more jurisdictions.

## VI. Conclusion; Order

Plaintiffs' motion under FED.R.CIV.P. 56(f) is hereby DENIED. The motions by The Dow Chemical Company and Corning Incorporated for summary judgment are hereby GRANTED. These rulings apply in all cases

---

**22.** It should be noted that the plaintiffs' request under Rule 56(f) is not itself untimely or lacking specificity; it was initially made in the first response by the PSC to these motions and the PSC has identified certain items of proposed discovery that it believes might result in helpful information. The court concluded that it would consider that request at the time of assessing the merits of the summary judgment motions and might, depending on that evaluation, grant plaintiffs' request either in the form of denying the motions or continuing them pending further discovery.

**23.** When faced with questions about portions of the minutes of meetings of Dow Corning's directors that had been withheld as irrelevant, the court undertook an in camera review of the two years' of these minutes and concluded that there had been adequate compliance with this court's Revised Case Management Order No. 5, (09/15/92), which called for the production of "all non-privileged materials that are potentially relevant in any of the cases or that are reasonably calculated to lead to relevant evidence."

in this court, now pending or subsequently filed or transferred, in which The Dow Chemical Company or Corning Incorporated is or may be named as a defendant.[24]

24. As with the recent decision in these proceedings involving the motion of Baxter International Inc. to be dismissed for lack of personal jurisdiction, this opinion will be published because of its possible utility in breast implant cases in state courts. For example, the Coordinating Judges for implant litigation in Pennsylvania recently ordered that consideration of potential claims against Dow and Corning be deferred pending further development of these issues and discovery in the MDL proceedings. *See Ford v. McGhan Medical Corp.*, No. 135 Common Pleas Court of Allegheny County, Penn. (Sept. 7, 1993) (Cassimatis, Moss, Wettick, JJ.).