**BIJOU–PENSACOLA CORPORATION,**
Plaintiff,

v.

**UNITED STATES of America,**
**Defendant.**

Civ. A. No. 885.

United States District Court
N. D. Florida,
Pensacola Division.
April 22, 1959.

**310**

Robert E. Sher, Abraham J. Harris, Washington, D. C., for plaintiff.

Charles K. Rice, Asst. Atty. Gen., James P. Garland, Lyle M. Turner, George Elias, Jr., Attys., Dept. of Justice, Washington, D. C., Wilfred C. Varn, U. S. Atty., Tallahassee, Fla., for defendant.

DE VANE, District Judge.

The issues raised by this case necessitate a detailed statement of the facts involved. Most of the controlling facts were stipulated by the parties. The only facts not stipulated were certain testimony of witnesses for plaintiff which is in no way denied by defendant.

Plaintiff is a Florida corporation which operates a motion picture theatre for Negro patrons in Pensacola Florida. Fifty per cent of the stock of plaintiff is owned by Crescent Amusement Company, which operates a circuit of motion picture theatres in the state of Tennessee. Twenty-five per cent of the stock is owned by G. Tom Bailey, who operates motion picture theatres catering to Negro patrons in the Atlanta, Georgia, area. The remaining twenty-five per cent of the stock is owned by Mr. Milton Starr, who operates a circuit of theatres catering to Negro patrons throughout the southern part of the United States. Mr. Starr has been in the business of operating colored motion picture theatres in the south for more than forty years. The headquarters of his circuit is in Nashville, Tennessee.

While serving with the War Production Board in Washington, D. C., during World War II, Mr. Starr learned that there had been a substantial migration of Negroes from the south to various industrial centers in the north to help man some of the war industries. Based on his experience in the motion picture business, he believed that colored moviegoers preferred to attend motion picture theatres patronized by their own race and he reached the conclusion that motion picture theatres catering primarily to colored patrons could be operated successfully in those northern industrial centers to which large numbers of Negroes had migrated during the war. One such city was Akron, Ohio.

District Theatres Corporation is a Delaware corporation which operates a circuit of motion picture theatres catering to colored patrons in the states of Maryland, Virginia and in the District of Columbia. Mr. Starr discussed his idea with officers of District and it was agreed that plaintiff and District would go into the Akron venture together.

On the basis of Mr. Starr's experience in building motion picture theatres in various parts of the United States in the years 1940 through 1947, he and District officials were of the opinion that the Akron theatre could be constructed at a cost of something under $100,000. Other theatres of comparable size and construction had been built for less.

When the venture was started mortgage money was plentiful immediately after World War II and mortgage financing to the extent of 60% of the cost of the theatre was readily available. With the above facts in mind, plaintiff and District planned to finance the construction of the Akron Theatre by means of a mortgage for $60,000 and by providing equity capital in the sum of $40,000.

A Maryland corporation known as Maryland Theatre Corporation was organized to construct and operate the Akron theatre. Plaintiff invested $19,-900 in the stock of this corporation and District Theatres Corporation invested $20,100 therein. As motion picture theatres operate on a strictly cash basis and need very little by way of working capital, no substantial amount of working capital was provided. Thus it was contemplated by the parties that the $40,000 invested in stock and the $60,000 in a mortgage loan would be ample to finance the enterprise until it got on its feet financially. From the experience these parties had had in the past, they were all fully aware that colored motion picture theatres were extremely profitable ventures.

In October, 1947, Mr. Starr and Mr. Morton Gerber, President of District Theatres, visited Akron and acquired the land on which the theatre was to be constructed, the land costing $23,750. A motion picture theatre is a special purpose building which has very little value for any other type of business. Very soon after the land was acquired, the original plans for the construction of the theatre building began to go astray. At about that time war time building restrictions were lifted and war time price controls were eliminated. Because there had been practically no building except for war time uses during World War II, a building boom began as soon as controls were lifted and prices of labor and materials sky-rocketed. Serious delays were encountered in obtaining an architect to draw plans for the theatre and contractors who were willing to undertake the construction were hard to find. As a result, eighteen months elapsed from the time the land was acquired until the building was completed, instead of the anticipated six months and the total cost of the land, building and equipment came to $155,491.55 instead of the anticipated $100,000 or less.

At the same time there was a sharp tightening of the mortgage money market and instead of being able to secure sixty per cent mortgage financing as originally contemplated, the parties were only able to secure $60,000. Adding this to the amount invested by way of equity capital left a deficit of $55,491.55. The interested parties decided to advance the needed additional money to the theatre company by way of loans evidenced by demand notes. Relying upon their experience of the highly profitable operation of Negro theatres in those days, it was anticipated that the notes would be paid off in a relatively short time. Witnesses for plaintiff testified that 1946 and 1947 were the most profitable years in the entire history of the motion picture industry and that nearly all colored motion picture theatres were operating on a highly profitable basis.

To meet the debt situation confronting Maryland Theatre Corporation, District Theatres and plaintiff each advanced $30,000 to Maryland and received demand notes for same. The funds so

advanced were used to complete the construction of and to equip the theatre.

The theatre opened in April, 1949. It was not a success. Instead of making money, it lost money. The losses amounted to $20,733.32 in 1949; $13,135.58 in 1950; $7,961.04 in 1951; $11,336.08 in 1952 and $2,398 in the first five months of 1953. To provide the necessary funds to keep the theatre going during these loss periods, plaintiff and District each made additional loans to Maryland Theatre Corporation from time to time between June, 1949, and June, 1953. Each of them received demand notes from Maryland for the amount of the advances, the notes bearing interest at the rate of 3% per annum. By June, 1953, each of the parties had made additional loans to Maryland Theatre Corporation in the amount of $25,000. Adding these sums to the $30,000 previously advanced for the construction and equipment of the theatre, made a total of $55,000 advanced to Maryland by way of loans by each of the participating parties.

Early in 1953 plaintiff's Board of Directors decided that the theatre was a hopeless proposition and that they would make no further advances to Maryland Theatre Corporation. They instructed Mr. Starr to so advise Maryland and to make the best possible settlement with Maryland for the $55,000 of outstanding loans. Mr. Starr advised Maryland of the decision of the Board and following negotiations between the parties, plaintiff entered into an agreement with Maryland to compromise and cancel the latter's $55,000 debt to plaintiff for the sum of $1,000. At the same time, plaintiff surrendered to Maryland all of its outstanding capital stock in that corporation. The $54,000 was ascertained by plaintiff to be, and was charged off on its books of account as, uncollectible and worthless.

Because of the fact that District Theatres Corporation was anxious to avoid having a company in which it had an interest default on a mortgage, District decided to continue to operate the theatre in Akron in the hope that it might still work out successfully. After plaintiff surrendered its stock and cancelled the indebtedness, Maryland Theatre Corporation was a wholly owned subsidiary of District. District continued to operate the theatre for a period of three years. Each of the years was a loss year and finally in June, 1956, the theatre was closed. During this three-year period attempts were made to dispose of the property without success. After the theatre was closed these attempts were intensified, but no buyer was found. Finally the theatre was turned back to the holder of the first mortgage, which still holds it.

This case involves the right of plaintiff to claim the $54,000 as a bad debt pursuant to Section 23(k) of the Internal Revenue Code (now 26 U.S.C. § 166).

### Advances to Meet Capital Requirements

If the parties involved in this venture possessed the right under the law to capitalize and finance this venture in a way to suit themselves, then plaintiff is entitled to win in this controversy. Plaintiff insists upon this right and cites for its authority three comparatively recent decisions of the Court of Appeals for the Fifth Circuit as follows: Rowan v. U. S., 1955, 219 F.2d 51; Sun Properties v. U. S., 1955, 220 F.2d 171; Giblin v. Commissioner, 1955, 227 F.2d 692.

It is interesting to note in this connection that the actions of the parties in setting up the corporate structure of Maryland Theatre Corporation followed closely throughout financial arrangements approved by the decision of the Court of Appeals of the Ninth Circuit in Wilshire and Western Sandwiches, Inc. v. Commissioner, 1949, 175 F.2d 718. It is the opinion of this Court, however, that the decisions of the Fifth Circuit Court cited above and Wilshire and Western Sandwiches, Inc. v. Commissioner are not controlling in this case. The evidence in the case undisputedly shows that $30,000 of the loans made by plaintiff to Maryland was made for the

sole purpose of construction and prior to the time operations began and that this case is controlled, insofar as the $30,000 loan is concerned, by the opinion of Circuit Judge Sibley in Arnold v. Phillips, 5 Cir., 117 F.2d 497. In this connection the Court points out that in Rowan v. U. S., supra, Circuit Judge Tuttle was dealing only with advances made for operating expenses after the business had begun operation, and in the case of Sun Properties v. U. S., supra, the matter there involved was a business transaction consummated after the corporation had been organized, had already done some business and was ready for more.

The Court holds that upon all the facts in this case, the original $30,000 advanced by plaintiff for the purpose of completion of the theatre building in Akron, Ohio, was a contribution toward capital and not a debt subject to deduction under Section 23(k) of the Internal Revenue Code.

### Contributions to Meet Operation Expenses

The evidence in the case shows that in addition to the $30,000 just mentioned above, plaintiff contributed from June 9, 1949, to June 8, 1953, inclusive, the sum of $25,000 to meet losses from operation of the Akron theatre. These contributions are in an entirely different category to the $30,000 considered above. The amount of contributions to meet operation expenses should be reduced by the $1,000 received from Maryland Theatre Corporation for the cancellation of the $55,000 advanced to it by plaintiff and the surrender of all its stock in Maryland Theatre Corporation.

The decisions of the Court of Appeals, Fifth Circuit, in Rowan v. U. S., supra, and Sun Properties v. U. S., supra, are applicable to and controlling in connection with this claimed deduction and the Court holds this $24,000 is clearly deductible under Section 23(k) of the Internal Revenue Code.

■ Defendant, in its ever present vigilance to recover income taxes and to hold and keep what it recovers, argues that taxpayer must show with respect to each advance made by it that an event occurred during the fiscal year ending June 30, 1953, which made them worthless, and, having identified such an event, must also show that the debts had value at the end of the preceding taxable year. No such drastic rule of law should be or will be applied in this case. The record shows the debts and capital stock were clearly valueless and the action of the plaintiff in ridding itself of further liability in connection with its ownership of them was the event that entitles it to charge off the bad debts deductible under the provisions of Section 23(k) of the Internal Revenue Code.

A final judgment will be entered herein in conformity with this memorandum decision.