In re HILLSBOROUGH HOLDINGS CORPORATION, et al., Debtors.

HILLSBOROUGH HOLDINGS CORPORATION, et al.,
Plaintiffs,

v.

The CELOTEX CORPORATION, et al., Defendants.

Bankruptcy Nos. 89–9715–8P1 to 89–9746–8P1 and 90–11977–8P1.
Adv. Nos. 90–03, 90–04.

United States Bankruptcy Court,
M.D. Florida,
Tampa Division.

April 18, 1994.

Don Stichter, Stichter, Riedel, Blain & Prosser, Tampa, FL, Michael Crames, Kaye, Scholer, Fierman, Hays, New York City, for debtors.

Marsha Rydberg, Rydberg, Goldstein & Bolves, Tampa, FL, Elihu Inselbuch, Caplin & Drysdale, New York City, for defendants.

Sara Kistler, Tampa, FL, U.S. Trustee.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND MEMORANDUM OPINION

ALEXANDER L. PASKAY, Chief Judge.

THIS IS an adversary proceeding commenced in these yet-to-be-confirmed Chapter 11 cases of Hillsborough Holdings Corporation (HHC), now known as Walter Industries, Inc., and its 31 wholly-owned subsidiaries (collectively referred to as the Debtors). In this connection, it should be noted that none of the Chapter 11 cases have been substantially consolidated, although procedurally the Debtors have been treated as a group as the matter involved impacts the interests of all Debtors.

In order to fully understand the role of the parties involved in this litigation, it is important to note that prior to 1987, the Debtors, together with other non-debtor entities, operated within the corporate structure of Jim Walter Corporation (JWC) acting as the holding company, owning all the stock in each of the subsidiaries, including Celotex Corporation (Celotex). In 1987, JWC was the subject of a leveraged buy-out, out of which HHC emerged as the new holding company and it is now the parent of all the subsidiaries of JWC except Celotex which was not part of the group of subsidiaries which emerged after the leveraged buy-out.

The matter under consideration was presented by a Complaint filed by the Debtors on January 2, 1990 seeking declaratory relief. In their Complaint, the Debtors named as defendants Celotex, JWC, and hundreds of individuals (collectively referred to as Asbestos Claimants) who claim to have suffered personal injuries as the result of exposure to asbestos products manufactured and distributed by Celotex.

In Count I of the Complaint, the Debtors sought a declaration that the corporate veil between Celotex and JWC cannot be pierced. In Count II of the Complaint, the Debtors sought a declaration that the leveraged buy-out of the JWC subsidiaries, which did not include Celotex, was not a fraudulent transfer. In Count III, the Debtors sought a declaration that under applicable law, they are not the successors in interest (sic) to the asbestos-related personal injury claims asserted against JWC or Celotex. In Count IV, the Debtors sought a declaration that under applicable law, they are not liable for the asbestos-related claims against either JWC or Celotex.

Extensive discovery was undertaken by both sides, and on February 28, 1992, the Debtors filed a Motion for Summary Judgment, contending that there were no genuine issues of material facts and based on the undisputed facts they presented, that they were entitled to the relief sought as a matter of law.

In due course, this Court heard argument of counsel for the respective parties, considered the extensive record relevant to the motion, and on August 25, 1992 entered an Order denying the Debtors' Motion for Summary Judgment, based upon the Court's conclusion that there were in fact genuine issues of material fact which, of course, prevented the disposition of the controversy as a matter of law. Shortly thereafter, this Court scheduled a pre-trial conference in order to prepare the remaining issues for final evidentiary hearing. On February 3, 1993, this Court entered an Order at the conclusion of the pre-trial conference, which set forth five specific issues to be tried at the final evidentiary hearing. They are as follows:

(1) whether or not during the period relevant, JWC exercised such pervasive dominant control over the affairs of Celotex which, in fact, made Celotex nothing more than a sham or an alter ego of JWC;

(2) whether or not the inter-company transactions between Celotex and JWC disregarded all hallmarks of the separateness of the legal and equitable existence of a subsidiary from its parent, that is, the operation of the cash management system, and the record-keeping activities of both entities concerning inter-company transactions;

(3) to what extent JWC was involved in the decision-making process concerning the sale of assets of Celotex;

(4) whether or not the disposition of assets of Celotex was based on a valid economic

basis and was fully justified by the prevailing market conditions; and

(5) whether or not the utilization of the proceeds in fact was not repayment of valid obligations and resulted in rendering Celotex insolvent and without sufficient assets to respond to the claims of the Asbestos Claimants.

Additional discovery was allowed, but limited solely to the five (5) issues specified, and on December 13, 1993, the trial commenced on schedule. During the five days of trial, the Court received live testimony of witnesses, and received in evidence close to three thousand exhibits, including numerous charts and summaries of the testimony of the witnesses. Having received the trial transcript, and the post-trial briefs, submitted by the parties, the resolution of the five specific issues is now ripe for consideration.

Before discussing in detail the facts as established at the trial, it should be noted at the outset that, notwithstanding the formal and technical line-up of the litigants in this adversary proceeding, in which the Debtors are nominally the Plaintiffs, the party who carries the burden of proof is in reality the Asbestos Claimants, the named Defendants. In order to place these several claims and the relief sought in proper context, it should be helpful to understand the core of the controversy. The claims asserted by the Asbestos Claimants are two-fold. First, the Asbestos Claimants seek to pierce the corporate veil between Celotex and JWC, the predecessor-in-interest of HHC. Second, if the Asbestos Claimants are successful in piercing the corporate veil and then hold JWC liable to their claims already asserted against Celotex this, in turn, would, according to the Asbestos Claimants, would have rendered JWC insolvent thus the transfer accomplished through the LBO could be attacked and set aside as a fraudulent transfer. In preparing these issues for trial, this Court concluded that the veil-piercing issue was a threshold issue, and therefore, should be tried first and, only in the event the Asbestos Claimants succeed on the veil-piercing issue, will this Court consider and try the fraudulent transfer issue.

It should also be noted that the central issue in this adversary proceeding is not the liability vel non of any of these Debtors to the Claimants, since it is beyond dispute that HHC and the other debtor subsidiaries never manufactured, distributed or sold any products containing asbestos. Thus, one must focus solely on the veil piercing issue, and nothing relevant to the fraudulent transfer claim will be considered and treated by this memorandum opinion. The facts relevant to the issues outlined in the February 3, 1993 Order, as established at the evidentiary hearing, through testimony and documentary evidence are as follows:

## HISTORICAL BACKGROUND

JWC was formed in 1955 as a successor to Walter Construction Company, the home building business founded by James Walter in 1946. In 1964, JWC acquired a 100% interest in Celotex Corporation, a large manufacturer of home and building materials. In 1970, JWC became the holding company of its several operating entities, in order to manage their diverse and large business activities, which included coal and marble mining, and the manufacture of gypsum board, building materials and cast iron and ductile pipe.

In April of 1972, Celotex acquired a controlling interest in The Panacon Corporation (Panacon) with a $62 million loan obtained from its parent JWC. Shortly thereafter, Celotex and Panacon merged with the unanimous written consent of the Board of Directors of Celotex and Panacon. At the time of the acquisition by Celotex, Panacon had revenues of $181.1 million, net income of $10.6 million and assets of $106 million in 1971, and employed 5500 people.

Beginning in the mid–1970's, numerous lawsuits were initiated against Panacon by parties who claim to have been injured as the result of alleged exposure to products distributed and sold by Panacon which contained asbestos. After the merger, Celotex was named as a defendant in these lawsuits. A great majority of these lawsuits alleged liability based on pre–1972 activities of Philip Carey Corporation, a predecessor-in-interest of Panacon.

Due to JWC's role as a parent of its wholly-owned subsidiaries, the members of its Board of Directors also sat on the Boards of the subsidiaries, including the Board of Celotex. In addition, JWC established a central cash management system through which JWC and its wholly-owned subsidiaries managed both payables and receivables. It is the propriety vel non of the cash management system and the alleged pervasive control by JWC over the affairs of Celotex, especially the disposition of certain assets of Celotex, which are central in the determination of the rights of the Asbestos Claimants to pierce the corporate veil of JWC.

## CASH MANAGEMENT SYSTEM AND FINANCING

The cash management system for all of its wholly-owned subsidiaries, was established by JWC in the 1970's. Under this system all cash generated by the subsidiaries was transferred to the central cash management account maintained by JWC in Tampa. Payments to the subsidiaries were made directly to a depository bank account maintained by the subsidiary ("lock box"). These funds were then wire transferred to the JWC concentration account. JWC maintained a record of the funds deposited into the concentration account by each subsidiary, and entered a credit on the books of the subsidiary in an amount equal to the amount of the cash deposited into the concentration account.

The funds in the cash management account were used in the overall operation of JWC, both for day-to-day operations and also to provide intercompany loans to the subsidiaries at rates more favorable than those available at outside institutional lenders. Each subsidiary maintained its own checking account and had the discretion to pay its own expenses. However, the checking account was a "zero-balance" account. The subsidiary wrote checks against the zero balance and, at the end of the day, JWC transferred enough money into the subsidiary's account to cover the checks negotiated against the account, thereby always maintaining a zero balance in the account. The funds transferred into the zero balance account were

recorded as an intercompany payable on the subsidiaries' books.

JWC also provided services to its subsidiaries, and assessed a charge upon the subsidiaries for these services. These services included professional services, such as legal advice, accounting and tax services, as well as human resources and investment advisory services. The corporate assessment also included the cost incurred by the parent of obtaining money and making it available to the subsidiaries. Finally, the costs of insurance premiums and taxes were also paid by the subsidiaries as a part of the corporate assessment. The corporate assessment was calculated based on a proportion of the projections of net assets employed, by the respective subsidiary. JWC used the preliminary budgets prepared by the subsidiaries, summarized their net assets employed in any given business years. JWC then would divide the total expenses of JWC by the net assets employed, arriving at a break-even rate, provided that each subsidiary met its projected budget for the coming year. That rate was then used by the subsidiaries in their budgets to calculate the corporate assessment to be paid to JWC. Because of fluctuations in interest rates on the money borrowed by JWC, the actual costs of the services provided by JWC changed, and therefore, there were times when the corporate assessment collected was more than was necessary to cover costs of JWC, and other times the assessment collected was less than was required to meet the operating expenses of JWC. Be that as it may, there always was an adjustment made on the records, either by a debit or a credit entry to reflect the deviation from the projected budget. The cash management system was operated by JWC through their separate bank accounts, the "501 account" and the "502 account." The 501 account contained all funds which were deposited into the cash management system, i.e. deposits from the subsidiary lock boxes. The 502 account maintained all other transactions. Into this account would be payments made directly to JWC on behalf of the subsidiary, corporate assessments and intercompany adjustments. The 502 account generated a statement to the subsidiary any time any transaction was made which affect-

ed that subsidiary. It was for that reason that payments made directly to JWC on behalf of the subsidiary were deposited in the 502 account, which would generate an "advice" to the subsidiary notifying the subsidiary that a payment on an accounts receivable had been made. The 501 account and the 502 account were reconciled against each other on a monthly basis.

One of the items which was recorded on the 502 account was loans made by JWC to Celotex and to other subsidiaries. As a general practice, JWC would obtain outside financing and funnel the proceeds of the loan down to its subsidiaries as it was needed, generally, but not always, for capital expenditures. This practice made economic sense and was beneficial to both JWC and to all subsidiaries, and to Celotex as a subsidiary because JWC was able to obtain financing at more favorable rates than any individual subsidiary would have been able to obtain on their own. In addition, to acquire outside financing by a subsidiary alone would have resulted in significant limitations on the financing imposed by the lender, even if obtained, and rigid reporting requirements, and certainly would have required substantial and significantly higher interest rates for the loan. Advances by JWC to the subsidiaries, including Celotex, were never fully formalized by the execution of loan documents or promissory notes. However, it is equally without dispute that no additional stock in Celotex, or in any other subsidiaries, were ever issued to JWC as consideration for these advances. These advances were recorded on the 502 account ledger as an inter-company payables, acknowledged by the officers of Celotex as an obligation due to JWC, and were payable upon demand.

## CORPORATE GOVERNANCE

A substantial part of the evidence presented extensively focused on the corporate structure both of JWC and of Celotex. As noted earlier, Celotex and several others were a wholly-owned subsidiaries of JWC, and as such, members of JWC's Board of Directors also sat on the Board of Celotex and the other subsidiaries. JWC had, in addition to the traditional officers of corpora-

tions such as President, Chief Executive Officer, Chief Financial Officer, etc., also had five Group Vice Presidents who were responsible for specific business areas of the Company. Subsidiaries reported both to Group Vice Presidents as well as to the traditional management of JWC. There is no question that the Board of JWC was intimately involved in long-term decision making which affected specific subsidiaries as well as the health of the parent and all of its subsidiaries. These decisions included acquisition and construction of plants, the sale or closing of plants, and the acquisition or transfer of assets. The JWC Board also monitored key events of subsidiaries and provided oversight functions, but there is no evidence in this record which warrants the finding that JWC was involved in the day-to-day operation of the business of the subsidiaries.

It is also true that the Board of Directors of Celotex seldom met face-to-face, but as a general rule they acted by written consent to any proposed action to be undertaken by the Board. Celotex hired and fired, independent of JWC its own employees; was in full charge of its own payroll and the promotion of its employees, with the exception of management if the proposed promotion did deviate from the procedural guidelines established by JWC for all subsidiaries. Celotex maintained its own corporate minute books and its individual accounting records in which all transactions involving inter-company transactions were properly recorded.

Celotex itself had its own subsidiaries and divisions. Certain of Celotex's businesses, Celotex's "core" businesses, were included in one of three divisions: Building Products, Roofing Products and Industrial Products. These divisions reported directly to the president of Celotex. However, the subsidiaries of Celotex, which were not part of the three divisions just described, reported directly to the Group Vice Presidents of JWC. Although standing alone, this reporting structure appears odd, within the complete structure of JWC, it is apparent that the subsidiaries and divisions of the Company reported through profit centers designated along business lines established in order to enable JWC to monitor the performance of its sub-

sidiaries. This method of reporting allowed JWC to report the financial health of the subsidiaries when JWC filed its Report with the Securities and Exchange Commission, and of course in its annual report to its shareholders.

## ASSET DISPOSITIONS

During the 1980's, the United States faced a recession which was marked by high interest rates and inflation. These high rates affected JWC's business as it chilled the real estate market, making it unattractive to purchase homes. As a result the demand for construction of homes and construction components fell. In addition, JWC was carrying approximately $1 billion in long and short term debts. All of these debts were on adjustable interest or on floating interest rates so, as the interest rates climbed, which eventually passed 20%, the amount owed by JWC also increased and reached the point when the outstanding loans could not longer be managed.

As a result of the drastic downturn of the market, JWC embarked upon a cost-cutting plan. The initial plan included an evaluation and re-evaluation of the operating expenses of the Company as a whole, and of each subsidiary, as-well-as an evaluation of the economic viability of each of the subsidiaries and its respective divisions. The evaluations of the viability of particular businesses were done at the subsidiary level initially by the officers of each subsidiary.

As a result of this evaluation process, particular subsidiaries were targeted for sale. Some, but not all, of the subsidiaries targeted for sale were owned by Celotex and were targeted by the Celotex officers for sale. Between 1981–1987, twenty-one subsidiaries or divisions were sold, and an additional eight operations were simply closed, because they could not be sold. Of the twenty-one companies sold, seventeen companies were owned by Celotex, and fifteen of those were sold to third parties. The sales of Celotex subsidiaries or divisions generated $151.6 million. Overall, these companies were businesses which had historically performed poorly, and this poor performance reached an economically unacceptable stage during the recession of the 1980's. There is no dispute that the Board of Directors of Celotex and also the Board of JWC was involved in each of these sales.

By way of example, in August, 1982, Hamer Lumber was sold. Hamer was originally acquired by JWC as an in-house supplier of raw materials. In 1977, Celotex purchased Hamer from JWC. During the years Hamer was held by Celotex, Hamer saw only two profitable years. In late 1981, JWC received an unsolicited inquiry from Plum Creek Lumber Co. for purchase of Hamer. JWC and Celotex decided to pursue the sale, and on August 27, 1982, the Celotex and JWC Boards of Directors approved the sale of Hamer to Plum Creek for a price of approximately $12 million.

For instance, Jim Walter Doors was formed by Celotex in 1972 with the combining of four divisions. By the late 1970's, Doors was in financial trouble, and between 1975 and 1978, Doors lost $10 million in pretax dollars. Attempts were made to sell Doors during the 1975 and 1978 time period, but all attempts failed. In 1981, Doors lost almost $9 million. In 1982, Celotex recommended either sale or closure of Doors. JWC approved the recommendation, and Doors' Portland, Charlotte and Century plants were closed. The balance of Doors operations were sold in pieces over the next few years, ultimately realizing proceeds of $12.1 million.

The proceeds generated by the sale of the Celotex subsidiaries were then used to reduce and ultimately satisfy the outstanding amounts of intercompany advances made by JWC to Celotex. This payable was made up of the corporate assessments, as well as the advances made by JWC, which JWC and Celotex both characterized as inter-company "loans."

## ASBESTOS LITIGATION

There is no question that during the time period between 1972 and 1987 asbestos litigation increased, and the number of lawsuits served upon Celotex, naming Celotex as a defendant also increased. In fact, between 1973 and 1981, the number of plaintiffs with

cases pending against Celotex had doubled each year. Further, between 1982 and 1983, lawsuits against Celotex increased from 15,100 to 20,100; between 1983 and 1984, it increased to 25,600; and between 1984 and 1985, it increased to 34,900. Litigation costs also increased, from $18 million in 1982, to an ultimate $79 million in 1987.

The management of Celotex, and of JWC were fully aware of the impact of the asbestos litigation on the economic health of Celotex and of course also indirectly upon JWC. In fact, the JWC legal department regularly distributed reports on the number of claims and the cost of settlements and the prospect of litigation to the officers and to the Board of Directors of JWC. In addition, JWC's annual reports and Forms 10–K filed with the SEC regularly disclosed the key facts concerning asbestos litigation.

Basically, these are the salient facts established at the trial, upon which this Court is called upon to resolve the claim under consideration; that is, the right of the Asbestos Claimants to pierce the corporate veil of JWC.

## BURDEN OF PROOF/CHOICE OF LAW

■ It should be noted at the outset that the party seeking to pierce the corporate veil bears the burden of proof. *Matter of Multiponics, Inc.*, 622 F.2d 709 (5th Cir.1980); *Kingston Square Tenants Ass'n v. Tuskegee Gardens, Ltd.*, 792 F.Supp. 1566 (S.D.Fla. 1992); *Publicker Indus., Inc. v. Roman Ceramics Corp.*, 603 F.2d 1065 (3rd Cir.1979). This burden does not change because the Debtors are the plaintiffs in this declaratory action. Moreover, the Asbestos Claimants concede that the burden of proof is placed on them.

■ This controversy is controlled by the applicable state law, either by the laws of the State of Florida or the State of incorporation of the Debtors, which is the State of Delaware. *In re Blanton*, 105 B.R. 811 (Bankr. W.D.Tex.1989). JWC is a Florida corporation and Celotex is a Delaware corporation, which raises the question of choice of law. In determining which state's law applies, the bankruptcy court must apply choice-of-law

rules of the state in which it sits. *In re Master Mortgage Inv. Fund, Inc.*, 151 B.R. 513 (Bankr.W.D.Mo.1993); *In re O.P.M. Leasing Svs., Inc.*, 40 B.R. 380 (Bankr. S.D.N.Y.) *aff'd* 44 B.R. 1023 (S.D.N.Y.1984); *In re Shepard*, 29 B.R. 928 (Bankr.M.D.Fla. 1983). Since this Court sits in Florida, Florida choice-of-law rules apply. Florida's courts look to the Restatement (Second) of Conflicts (1971) for choice-of-law questions. *See Bishop v. Florida Specialty Paint Co.*, 389 So.2d 999 (Fla.1980).

Section 145 of the Restatement of Conflict of Law sets forth the "most significant contacts test" to determine the choice-of-law. Under this test, Florida law would apply. Celotex and JWC were headquartered in Florida, this action is pending in Florida and JWC is incorporated in Florida. However, under § 307 of the Restatement of Conflict of Law, Delaware law would apply because the Asbestos Claimants seek to ultimately impose liability on the shareholder of a Delaware corporation. *See Jefferson Pilot Broadcasting v. Hilary & Hogan*, 617 F.2d 133 (5th Cir.1980). However, the resolution of this conflict in the application of law is largely insignificant, since the laws of Delaware and Florida are functionally the same. *In re Rodriguez*, 895 F.2d 725 (11th Cir. 1990).

## GENERAL PRINCIPLES RELEVANT TO THE ISSUES

Florida and Delaware courts disregard the corporate entity in only the most extraordinary cases. Those who seek to pierce the corporate veil, in either jurisdiction, carry a very heavy burden. *Eagle v. Benefield–Chappell, Inc.*, 476 So.2d 716 (Fla. 4th DCA 1985); *Harco Nat'l Ins. Co. v. Green Farms, Inc.*, 1989 WL 110537 (Del.Ch.).

■ In order to pierce the corporate veil under Florida and Delaware law, it is the claimant's burden to establish by a preponderance of the evidence that: (1) the shareholder dominated and controlled the corporation to such an extent that the corporation independent existence, was in fact non-existent and the shareholder shareholders were in fact alter egos of the corporation; (2) the corporate form must have been used fraudu-

lently or for an improper purpose; and (3) the fraudulent or improper use of the corporate form caused injury to the claimant. *Dania Jai–Alai Palace, Inc. v. Sykes,* 450 So.2d 1114 (Fla.1984); *Mobil Oil Corp. v. Linear Films, Inc.,* 718 F.Supp. 260 (D.Del.1989).

In order to overcome the presumption of the separate existence of the corporation from its shareholder, it must be established with the requisite degree of proof that the parent and the subsidiary operated as a single economic entity. *Mabon, Nugent & Co. v. Texas American Energy Corp.,* 1990 WL 44267 (Del.Ch.); *cf. Solomon v. Betras Plastics, Inc.,* 550 So.2d 1182 (Fla. 5th DCA) (individual liability imposed where "the personal affairs of the shareholder become confused with the business affairs of the corporation") *rev. dismissed,* 554 So.2d 1168 (Fla. 1989).

Under both the laws of Florida and Delaware, there must be persuasive proof of shareholder misconduct before a Court will pierce the corporate veil. The courts of both Florida and Delaware require proof of *deliberate* misuse of the corporate form—tantamount to fraud—before they will pierce the corporate veil. Thus, absent proof of fraud or ulterior motive by the shareholder, the corporate veil shall not be pierced. *Conant v. Blount,* 141 Fla. 27, 192 So. 481 (1939); *Advertects, Inc. v. Sawyer Industries, Inc.,* 84 So.2d 21 (Fla.1955); *Coryell v. Pilkington,* 39 F.Supp. 142 (S.D.Fla.1941), *aff'd* 128 F.2d 702 (5th Cir.1942), *aff'd* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943).

The Florida Supreme Court has unequivocally stated that "the corporate veil may not be pierced absent a showing of improper conduct." *Dania Jai–Alai Palace, Inc., supra.* It is true that the courts of this state do not hesitate to find such conduct where "the corporation was organized or employed for the purpose to mislead creditors or to work a fraud upon them." *Id.,* at 1120 (quoting *Advertects, Inc., supra; see also Gershuny v. Martin McFall Messenger Anesthesia, P.A.,* 539 So.2d 1131 (Fla.1989) ("courts will not look behind [the corporate] entity to hold liable the individuals who compose it absent fraud or some illegal purpose").

Florida cases after *Dania* looked to shareholders' subjective motivation, and not to the effect of their actions. In *Steinhardt v. Banks,* 511 So.2d 336 (Fla. 4th DCA) (per curiam), *rev. denied* 518 So.2d 1273 (Fla. 1987), the Florida District Court of Appeal offered a "workable formula for applying the [*Dania*] reference to 'improper conduct'." The court stated:

> Florida decisions uniformly hold that courts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham *to accomplish* some ulterior purpose, ... or where *the purpose is to evade* some statute or *to accomplish* some fraud or illegal purpose, or where the corporation *was employed* by the stockholders for fraudulent or misleading purposes, *was organized or used* to mislead creditors or to *perpetrate* a fraud upon them, or *to evade* existing personal liability. (emphasis added).

*Id.* (citing *Tiernan v. Sheldon,* 191 So.2d 87 (Fla. 4th DCA 1966), *cert. discharged,* 200 So.2d 183 (Fla.1967)). Thus it is that the improper conduct must be deliberate misconduct. *See also Barkett v. Hardy,* 571 So.2d 13 (Fla. 2d DCA 1990) (absence of corporate formalities, lack of equity capital, proof of domination and control, and that corporation was used as a vehicle for personal interest were insufficient to establish improper conduct); *Futch v. Head,* 511 So.2d 314 (Fla. 1st DCA) (veil pierced where shareholder employed corporation to cheat co-broker out of a sales commission), *rev. denied,* 518 So.2d 1275 (Fla.1987); *U–Haul Int'l v. Jartran, Inc.,* 793 F.2d 1034 (9th Cir.1986) (interpreting *Dania* to require actual fraud as a prerequisite to alter ego liability for trademark infringement).

One would have to be less than candid not to ignore the decisions which have considered also the "instrumentality/alter ego" theory in connection with the veil piercing actions. *See, e.g. Mabon, Nugent, supra.* Under this theory, once the plaintiff proved that the shareholder completely disregarded the corporate form, and in fact acted not as a corporation, the courts did not require additional misconduct to pierce the corporate veil. For

example, if the shareholders entered into business relationships as an individual and not as a corporation, especially if the shareholder ignored the formalities required by law, or held himself out to the market place as an individual, no doubt the shareholder will not be permitted to hide behind the corporate shield. Then the veil may be pierced for no other reason than that the shareholders are bound by their conduct and are estopped to hide behind the corporate veil.

However, no Delaware court actually held that the corporate veil may be pierced solely on the instrumentality theory. *See Mabon, Nugent, supra.* ("The Delaware courts have also stated, although not held, that the corporate veil may be pierced where a subsidiary is in fact a mere instrumentality or alter ego of its parent"). Nor is this Court aware of a Florida decision to the contrary. Moreover they do not stand for the proposition that misconduct is not required.

In this connection it should also be noted that this Court has already found in its Memorandum Opinion on the Motion for Summary Judgment that before one can resort to the instrumentality theory, there must have been a complete disregard for corporate formalities—where shareholders "have ignored the 'corporateness' of the corporation," *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983 (Del.Ch.1987), and where the parent and subsidiary corporations are "operated as a single economic entity such that it would be inequitable for [a] Court to uphold a legal distinction between them." *Mabon, Nugent, supra.*

It is clear that negligence or even reckless conduct, of which by the way there is not evidence in this case in spite of some insinuation and innuendo, are not sufficient to establish improper conduct under either Florida or Delaware law. In *Ally v. Naim*, 581 So.2d 961 (Fla. 3d DCA 1991), the plaintiff was an employee of a corporation that owned and operated food vending machines. In 1985, the corporation sold all of its machines to a third party. It continued to sell soda through 1988. From 1985 through 1989, the president and sole stockholder took all corporate income, net after expenses, as personal compensation. Plaintiff was injured in the course of his employment in 1986. He filed a worker's compensation claim. In 1990, unable to collect his judgment from the corporation, the plaintiff sued the individual stockholder. The trial court pierced the corporate veil and entered judgment against the individual stockholder.

On appeal, the Florida court reversed the judgment. Although the defendant had not set aside any corporate funds to cover the worker's compensation claim, the court refused to pierce the corporate veil "unless it is shown that the corporation was organized or employed to mislead creditors or to work a fraud upon them." *Id.* at 963 (quoting *Advertects, supra.*) The court further stated that "it is not enough to show that the corporation's 'business affairs had been rather poorly handled.'" *Id.*

In *Harco Nat'l Ins. Co. v. Green Farms, Inc., supra.*, a former employee sought to collect a worker's compensation judgment from he individual stockholders of Green Farms, Inc., his past employer. The corporation had failed to carry worker's compensation insurance, as required by statute, and was otherwise undercapitalized. In denying summary judgment on the plaintiff's veil-piercing claim, the court stated:

> [The stockholders] apparently made loans to Green Farms, Inc., and then obtained repayment by transferring assets from the corporation to themselves. Such a transfer of assets, however, is not necessarily a basis for piercing the corporate veil. The Plaintiffs must also show that such transfers *were done to defraud creditors or were done merely to siphon off corporate assets, rather than repay outstanding loans.* (emphasis added).

The conduct of the shareholder in both *Ally* and *Harco* was clearly negligent and reckless. Notwithstanding, in both cases the fact that the persons in charge breached their legal duty to provide insurance for their employees did not warrant piercing the corporate veil. The controlling caselaw requires more, intentional misconduct, or, put a different way, before the conduct may form the basis to disregard the corporate structure, it must be established that the corporation was

operated as a shell game and the corporate shield between the parent and subsidiary was nothing more than a sham. *Mobil Oil Corp., supra.*

In the present instance JWC had no legal obligation to assure that Celotex had adequate insurance to meet the projected and, in a large measure, the claims of the asbestos victims, some of whom are yet to be identified, related to the exposure of asbestos is certainly insufficient to conclude that they intentionally failed to provide for the Asbestos Claimants and would warrant piercing the corporate veil. There is hardly any question that even if the conduct of a parent is reckless or negligent, as a matter of law it is insufficient to carry the burden of proof placed on the parties who seek to pierce the corporate veil. Even assuming without conceding that JWC was negligent or even reckless by failing to assure that Celotex had enough insurance, this is not sufficient to warrant to pierce the corporate veil.

## PERVASIVE DOMINION AND CONTROL INTERCOMPANY TRANSACTIONS

### A. Cash Management System

■ One element of the attack on the corporate separateness of Celotex and JWC centered around the cash management system. It has been widely recognized in the corporate world that there is nothing inherently wrong in a parent managing all the cash generated by the subsidiaries through a cash management system. *Tyco Lab., Inc. v. DASI Indus., Inc.,* 1993 WL 356929 (N.D.Ill. 1993) (evidence that parent served a 'centralized cash management function' for itself and its subsidiaries did not justify piercing veil); *United States v. Bliss,* 108 F.R.D. 127 (E.D.Mo.1985) (claim that parent "manipulated cash flows through a cash management system" did not indicate anything more "than a usual parent-subsidiary relationship"); *Japan Petroleum (Nigeria) Ltd. v. Ashland Oil, Inc.,* 456 F.Supp. 831 (D.Del.1978) (fact that parent paid invoices of subsidiary "pursuant to a cash management system for its subsidiaries" was not grounds to pierce veil).

Based on this record there is no doubt, and this Court is satisfied, that the cash management system was totally consistent with sound business practices widely recognized in the corporate business world.

### B. Corporate Assessment

■ The next thrust of the attack by the Asbestos Claimants focused on the corporate assessment by the parent to its subsidiaries and contended it was somehow improper. In the case of *Pulte Home Corp., Inc., v. Ply Gem Industries, Inc.,* 804 F.Supp. 1471 (M.D.Fla.1992), the District Court for the Middle District of Florida held that:

> The only payments made by Hoover to Ply Gem are reasonable amounts that it, like the other operating subsidiaries, pays to compensate Ply Gem for financing and other services that Ply Gem provides to it, and provide Ply Gem with a reasonable return on its investment. Ply Gem charges Hoover a working capital fee that is calculated at a fixed percentage of Hoover's net working capital. The percentage rate changes annually and reflects the interest rate paid by Ply Gem to its own lenders. This rate is lower than any fixed rate that would be available to Hoover from outside lenders if Hoover were to finance its working capital.

*See also Johnson v. Warnaco, Inc.,* 426 F.Supp. 44 (S.D.Miss.1976) ("corporate charge" of 1.3% of sales was levied for services rendered by parent). Again, it is clear that there is nothing inherently improper in the assessment by a parent of charges incurred on behalf of the subsidiary. Without anything more, it is difficult to accept that the existence of a corporate assessment warrants the piercing of the corporate veil between Celotex and JWC.

This is evident inasmuch as had the parent not furnished the services for which it charged a reasonable cost, the subsidiary would have to obtain these services from outside sources at no doubt equal or greater cost. Such an arrangement would not have been conducive to an efficient or economic manner to conduct the business of the various enterprises.

## C. Line–of–Business Reporting

■ In the same vein, the line-of-business reporting and general oversight of the operations of a subsidiary by a parent is equally common and proper. This Court that the line-of-business reporting is a proper manner for a parent to oversee the operation of its subsidiaries and does not support the conclusion to pierce the corporate veil. *See In re Fairfield Plantation, Inc.,* 147 B.R. 946 (Bankr.E.D.Ark.1992) ("centralized records for all FCI subsidiaries were kept by FCI."); *In re School Asbestos Litigation,* 1993 WL 209719 (E.D.Pa.1993) (fact that subsidiary president and division manager reported to group vice president did not exhibit control necessary to pierce veil); *Fidenas AG v. Honeywell Inc.,* 501 F.Supp. 1029 (S.D.N.Y. 1980) (no piercing although parent reported subsidiaries' profits as part of parent financial, had a unified marketing plan, approved long range plans and annual plans, and held themselves out as a "single integrated worldwide operation"). These holdings are sound and all emphasize one basic point, that a 100% stockholder has the right to know what is going on with his investment. *In re School Asbestos Litigation, supra.*

## DECISION–MAKING PROCESS

■ Also, the Asbestos Claimants contend that the requirement of approval by the parent of capital expenditures, acquisitions and sales of capital assets was improper. There is substantial authority to support the proposition that such involvement by a parent is not only proper but common and has been approved by the courts. *See Phoenix Canada Oil Co., Ltd. v. Texaco, Inc.,* 842 F.2d 1466 (3d Cir.) *cert. denied,* 488 U.S. 908, 109 S.Ct. 259, 102 L.Ed.2d 247 (1988) (subsidiaries were "required to secure approval from their parent corporations for large investments and acquisitions or disposal of major assets"); *Craig v. Lake Asbestos of Quebec, Ltd.,* 843 F.2d 145 (3d Cir.1988) ("widespread involvement" in financial and management decisions, including "close scrutiny of new capital expenditure projects," did not rise to high standard of domination required to pierce the veil); *Quarles v. Fuqua Industries., Inc.,* 504 F.2d 1358 (10th Cir.1974) (it

is appropriate for a corporate parent to approve budgets and generally to supervise and coordinate subsidiaries' financial matters); *Mobil Oil Corp., supra.* (approval of major subsidiary expenditures merely demonstrated that parent and subsidiary were "closely connected" and did not warrant piercing the veil); *Akzona Inc. v. E.I. Du Pont De Nemours & Co.,* 607 F.Supp. 227 (D.Del.1984) (no piercing where parent had to approve capital expenditures of subsidiary); *D.L. Auld Co. v. Park Electrochemical Corp.,* 553 F.Supp. 804 (E.D.N.Y.1982) (no piercing where subsidiary "must follow the orders of [parent company] regarding significant business decisions"); *Fidenas, supra* (fact that parent approved subsidiary expenditures over a certain level did not support piercing).

The one and only asset of JWC was its stock holdings in Celotex. It would have been sheer, utter folly, and would defy common business sense to require the parent to stand aloof with its eyes closed to the subsidiary's activities concerning the acquisition and sale of capital assets. JWC owed, as a fiduciary, the duty to its stockholders to assure that nothing done by its wholly owned subsidiaries impaired or put in jeopardy the investment of its shareholders. Based upon the foregoing, this Court is satisfied that the involvement by JWC in the area of capital expenditure and capital liquidation was within the accepted standards of the corporate business world and was proper.

## MOTIVATION TO SELL ASSETS OF CELOTEX

In the last analysis the underlying basis of the Asbestos Claimants' position is based on the assertion that the assets of Celotex were sold in order to denude Celotex of its assets and render it unable to respond to the ever-growing claims of individuals and entities who claimed to have suffered damage as a result of exposure to products containing asbestos manufactured and/or distributed by Celotex. It is clear that all asbestos manufacturers were aware of the media coverage of the asbestos litigation, especially when Johns–Manville filed for protection under the Bankruptcy Code, the first major asbestos related Chapter 11 case. Everybody who

had a connection with asbestos or asbestos related products was fully aware of the progress of the Johns–Manville Chapter 11 case. One would be less than candid not to admit that this threat to enterprises who were connected and involved with asbestos would raise concern in the minds of the management of JWC and the legal department of JWC.

Juxtaposed to this disturbing and ever mounting development in the asbestos related litigation was the real and radical downturn of the economy due to the unprecedented inflation and an unheard of rise in the interest rates which, as noted earlier, approached and ultimately passed the 20% annual rate. It is unnecessary to indulge in any unwarranted speculation of the tremendous impact and the effect of this development on the real estate market, particularly on sales of new homes. One of the strongest and healthiest member of the JWC family was Jim Walter Homes, which builds prefabricated homes all over the country. The almost devastating impact of this development brought home to the management of JWC that it was presented with the inevitable choice between further attempts to strengthen business and struggle to survive through cost cutting and in the event that failed to produce the necessary results, possibly targeting certain parts of the JWC family for liquidation in order to raise the necessary cash to survive. The line of credit which was clearly the life blood of the economic health and the operation of the JWC family was in serious danger and thus it was absolutely imperative to secure the necessary cash to keep the ship afloat. The divisions or subsidiaries of Celotex which were targeted and were actually sold were historically poor performers, some never having generated any profit, and some only marginally.

■ There is no hard evidence in this record which would warrant the conclusion based on this record that JWC embarked upon conduct using its dominating position as a parent to liquidate the assets of Celotex specifically for the purpose of evading any possible liability resulting from the asbestos litigation. The most that could be said is that the theory advanced by the Asbestos Claimants is supported somewhat, albeit slightly, by this record. It is equally true that this record also supports, but with a greater force, the position taken by JWC that the liquidation proceeds were a result of a sound proper business judgment and was not motivated by any desire to injure the Asbestos Claimants or denude Celotex of its assets in order to assure that in the event they prevail they will not be able to obtain satisfaction of their judgments, if and when they obtain the judgments. This being the case it is clear that the record supports more strongly the claim of the Debtors and for this reason the Asbestos Claimants have failed to carry the burden placed on them which is persuasive and definitely the preponderance of the evidence.

## UTILIZATION OF PROCEEDS OF LIQUIDATION

*Repayment of Loans vs Recovery of Equity*

■ The propriety of the repayment of the intercompany payable with the proceeds of the asset disposition was hotly contested by the parties. The question centers around whether the intercompany payable was in fact a payable, i.e. debt, or really an equity investment, i.e. capital.

It should be pointed out at the outset that the financing of a subsidiary by a parent is not improper per se. This notion was has been repeatedly rejected by courts, finding that it is proper for the parent to provide all financing to the subsidiary. *In re Fairfield Plantation, Inc., supra.* See *Pulte Home Corp., supra,* (no piercing where parent financed subsidiary's working capital); *In re Blanton, supra,* (intercompany loans, documented only on accounting books, do "not reveal a disregard of the legal separateness of the various corporations, but only reflects the factual relatedness of the various corporations"); *Bliss, supra* (parent's guarantee of bank loans for subsidiary did not indicate a relationship "other than a usual parent-subsidiary relationship"); *Akzona Inc., supra* (parent "arranging financing" for subsidiary was not grounds for piercing veil); *Fidenas, supra* (fact that defendants procured loans for subsidiary was "common" and not

grounds for piercing the veil); *Japan Petroleum Co., supra* (treasury department of parent advanced funds to subsidiary as part of cash management system, but that was not grounds to pierce veil); *Johnson v. Warnaco, supra,* (parent obtained financing as needed, charging subsidiaries on inter-corporate-books).

Thus, in the last analysis the issue involves the proper classification of the advances—described by JWC as a bona fide loan and by the Asbestos Claimants as an equity investment. In determining whether the advance of funds is equity or debt, courts have looked to a variety of factors, including the initial capitalization of the corporation, the amount of shareholder control, the label placed on the transaction by the parties involved, the intent of the parties involved in the transaction, and the documentation of the transaction.

Turning first to the issue of whether the funds advanced were in fact bona fide loans or capital investment, Courts frequently consider the question of whether or not the corporation was initially properly capitalized or whether the capitalization was either nominal or "thin." The longer the corporation operated before the advance was made by the insiders, stockholders or affiliates, the less likely that the Courts will finds the corporation was undercapitalized, and the more likely the advance was a bona fide loan. *In re Regency, Inc.,* 96 F.Supp. 535 (D.N.J. 1951); *Costello v. Fazio,* 256 F.2d 903 (9th Cir.1958); *Bijou–Pensacola Corp. v. United States,* 172 F.Supp. 309 (N.D.Fla.1959). There is no question that Celotex was established long before it was acquired by JWC, and there is not a scintilla of evidence in this record that at its creation, Celotex was undercapitalized.

In addition to capitalization, the courts also look to the amount of control exercised by the shareholders of the parent over the affairs of the subsidiary. The absence of control has been a factor in cases where advances were determined to be loans, *In the Matter of Lumber Inc.,* 124 F.Supp. 302 (D.Ore.1954). However, the rule is best stated in the negative, that is, absence of control makes a strong case for the plaintiff, but the presence of control alone will not make out the case for finding that an advance of funds was an actual infusion of capital rather than bona fide loans. Although there is no question that there was a certain amount of control exercised by JWC over the affairs of Celotex and the other subsidiaries, it was exercised within the context of the holding company's relationship with its wholly owned subsidiary. This Court is satisfied that this control was within normal and accepted ranges. After all, the control by the parent was part and parcel of the parent's responsibility to its shareholders, to ensure that their investments would be monitored and would not be jeopardized, which might have occurred had JWC given an unbridled control and carte blanche authority to its subsidiaries, including Celotex.

Next, the courts frequently look at the label placed upon the advance in the corporate books. *In re Otis & Edwards, P.C.,* 55 B.R. 185 (Bankr.E.D.Mich.1985), ("A corporation's general ledger will usually reveal how payments on the receivables have been treated by the corporation."); The label placed upon the advance often reveals the parties' intent as to the treatment of the transaction, and as held in *In re Lane,* 742 F.2d 1311 (11th Cir.1984), a deciding factor is the intent of the parties. *Id.* at 1315. (quoting *Bayerlite Corp. v. Williams,* 286 F.2d 285 (6th Cir.1960) ("the decisive factor is not what the payments are called but what, in fact, they are, and that depends upon the real intention of the parties")); *Estate of Mixon v. United States,* 464 F.2d 394 (5th Cir.1972) ("we agree that the parties' intent to create either a debt or equity relationship is, in a sense, the ultimate issue to be determined here.") *In re Otis & Edwards, P.C., supra* ("The character of the debt depends on the intent of the parties at the time the transfer was made"). In the case of Celotex, both Celotex and JWC labeled the intercompany payable as a payable and treated the advance as such. This treatment of the intercompany payable was recognized to be debt not only by the parties involved, but also by third party lenders and financial analysts, and this payable was also reported as a

liability in the report filed with the Securities and Exchange Commission.

In sum, the funds advanced by JWC were no different than a line of credit transaction between an institutional lender and a creditor, in which the outstanding balance owed constantly fluctuates, yet there is no question that the outstanding balance is expected to be repaid. As a matter of fact, in this particular instance the funds advanced by JWC to Celotex were in fact, repaid in full.

Along with the label placed on the transaction, the formality of the transaction was placed into issue. It is without dispute that these advances were not evidenced by executed promissory notes, nor did the corporation issue additional stock for the advance. The answer to this question was furnished by *U.S. v. Fidelity Capital Corp.*, 920 F.2d 827 (11th Cir.1991) where the court determined that an entry of an advance on the corporate books is sufficient formality for an intercompany loan. *See also Stewart Bros. v. Allen,* 189 Ga.App. 816, 377 S.E.2d 724 (Ga.App. 1989) (checks demarcated as "loans" provided sufficient formality to establish debt). Based upon the foregoing, this Court is satisfied that the documentation of the advance, or the lack thereof, is not a fatal element in this situation. It is clear from the record that the parties involved intended that these advances be treated as debt, and Celotex understood it had an obligation to repay the funds advanced.

It is intimated in this instance, however, that the repayment by Celotex to JWC of the loans were somewhat tainted suggesting that the repayment of the loans by Celotex to JWC was improper because the funds used to make this repayment should have been kept by Celotex especially because these funds were realized from the liquidation of Celotex assets and should have been used to purchase adequate insurance to cover the claims of the Asbestos Claimants. Or put in a different way, the Asbestos Claimants contend that JWC was preferred over the bona fide claims asserted by the asbestos victims against Celotex and, therefore, this conduct was somewhat improper and by itself would warrant to pierce the corporate veil. To the extent that it is intimated or suggested that

these repayments were voidable preferences obviously misses the mark inasmuch as these transactions were way outside of any time frame provided by § 547 to avoid preferences, i.e., the one year time frame for insiders, § 547(b)(1)(B).

The contention that, because of the repayment of the advances by Celotex, JWC deprived Celotex from funds and assets which would otherwise be available to respond to the massive-tort claims, in this Court's opinion, also misses the mark. This same argument was examined—and rejected—by the court in *In re Silicone Gel Breast Implants Products Liability Litigation,* 837 F.Supp. 1128 (N.D.Ala.1993), where personal injury plaintiffs sought to pierce the veil between Dow Corning and one of its parents, Dow Chemical. Judge Pointer granted summary judgment rejecting the claim. He had this to say on the question of capitalization:

> One could argue that whenever the potential tort liabilities facing a corporation exceed its assets, the corporation is undercapitalized. Plaintiffs make this argument, but fail to cite any decision so holding, nor is this court aware of any such case. As the movants point out, such a definition of under-capitalization would result in limited liability for a corporation in the tort context only when it does not need it, i.e. when the corporation's assets are sufficient to satisfy its liabilities.
>
> ... [T]he plaintiff's argument is tantamount to a call for disregarding the limited liability of corporate organizations whenever a closely-held corporation becomes confronted with potential tort liabilities that could exceed its assets. *No court has taken such an expansive view of the veil-piercing doctrine,* and this court refuses to do so now.

837 F.Supp. at 1137–38 (emphasis added).

## CONCLUSION

Having considered the entire record together with the exhibits and being fully advised by post-trial submissions by the parties, there is no doubt that in the matter under consideration there is a lot of smoke, but not sufficient fire and the proof presented in support of the veil piercing claim is a

slender reed, indeed, upon which to hang a sword with sufficient strength required under the law to pierce the corporate veil. With some exception, the proof presented did not even reach the level of equilibrium which by itself would be insufficient to carry the burden of proof. Even on points viewed in the most favorable light which would support the Debtors' claims, such as JWC's motivation and its involvement in the asset disposition of Celotex, the record equally supports the theory urged by the Asbestos Claimants. It is equally consistent with the position taken by JWC and the Debtors that it was a solid and sound business decision and never reached the level of intentional wrongdoing which is required under the law to pierce the corporate veil.

A separate Final Judgment shall be entered in accordance with the foregoing.